Court File No. 07-CV-327376PD2

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE

BETWEEN:

JAN EISSES

Plaintiff

- and -

CPL SYSTEMS CANADA, INC.

Defendant

### STATEMENT OF DEFENCE

1. The defendant admits the allegations of fact contained in paragraphs 2, 3 and 5 of the statement of claim.

2. Except as may be otherwise expressly admitted herein, the defendant denies the allegations of fact contained in paragraphs 4 and 6 through 42 of the statement of claim. The defendant denies that the plaintiff is entitled to the relief claimed in paragraphs 1, 35, 41, 42 and 43 of the statement of claim.

3. The defendant has no knowledge in respect of the allegations of fact contained in paragraph 43 of the statement of claim.

### The Parties

4. The plaintiff, Jan Eisses, is an individual residing in Campbellville, Ontario. From 1988 to January 2007, Mr. Eisses was either the owner of or employed by the defendant, CPL Systems Canada Inc. ("CPL" or the "Company").

5. CPL is a company incorporated under the laws of Ontario. Among other things, the Company distributes, installs and services automatic lubrication systems and parts

throughout Canada. Such systems and parts are manufactured by Groeneveld Transport Efficiency International Holding B.V. ("Groeneveld"), a Dutch company.

6. From its formation in 1988 until 2001 CPL was fully owned by Mr. Eisses and his family through their holding companies. In 2001, Groeneveld acquired an 80% interest in CPL. In 2004, Groeneveld purchased the remaining 20% of CPL and CPL became a wholly-owned subsidiary of Groeneveld. In connection with these transactions, Groeneveld paid almost $4 million to or to the benefit of the plaintiff.

7. Contrary to what is implied in the statement of claim, Mr. Eisses was not a rank and file employee of CPL. Rather, the plaintiff is a multi-millionaire and a sophisticated and successful businessperson, who had bargaining power in the course of their dealings with each other that was equal to or greater than that of CPL.

**Longstanding Relationship**

8. The relationship between Mr. Eisses and Groeneveld began in 1988 in the Netherlands, when Groeneveld made Mr. Eisses (then a Dutch Citizen and resident) an independent distributor of Groeneveld products for the Canadian market. The relationship ended in January 2007 when, without any warning or regard for the interests of the Company, Mr. Eisses quit his employment with CPL, leaving it with no President.

9. At the time of his resignation, Mr. Eisses and CPL's senior management were engaged in heated discussions over Mr. Eisses' mismanagement of the Company and his insubordination, including the plaintiff's failure and refusal to adopt and implement the business model directed by his superiors. CPL's goal was for Mr. Eisses to bring management of its North American operations into conformity with Groeneveld's world-wide company policies.

10. During the course of their heated discussions, Mr. Eisses refused to follow directives and taunted senior management to terminate his employment, and CPL countered with a threatened wage reduction. However, CPL's threat was only bluster,

as Mr. Eisses knew or ought to have known. At no time did CPL reduce Mr. Eisses' pay or take any other action against him.

11. The 19-year relationship between Mr. Eisses and Groeneveld reflects a course of dealing that provides the proper context within which to assess the events leading up to the plaintiff's resignation. The parties' expectations during these final negotiations can be understood only if viewed within that context. Their long relationship was characterized over the years by intense, and often heated, negotiations between them over various business issues. The discussions and negotiations that took place throughout January 2007 were no different. CPL believed that Mr. Eisses was planning to attend a meeting that had been scheduled in the Netherlands, and fully anticipated that they would come to a mutually agreeable resolution of the then current dispute during that meeting.

12. Instead of making reasonable attempts to resolve their differences, Mr. Eisses chose to skip the meeting and quit his job. CPL management was notified of Mr. Eisses' resignation through a letter from his solicitors on January 28, 2007.

13. Given the plaintiff's behaviour and requests to be terminated from his employment, it is clear that he wished to sever his employment with CPL and was simply attempting to manipulate the situation to his own advantage. In all of the circumstances, the plaintiff's sudden resignation was voluntary.

### 2001 Share Purchase Agreement

14. In or about 2001, following the first 13 years of their business relationship, Groeneveld purchased 80% of the shares of CPL for a purchase price of approximately $2,700,000 (the "2001 Share Purchase Agreement"). The 2001 Share Purchase Agreement also gave Groeneveld the option of purchasing the remaining 20% of CPL's shares in the future. As expected in light of their prior relationship, the negotiation of the 2001 Share Purchase Agreement between Mr. Eisses and Groeneveld was characterized by tough bargaining and significant posturing by both parties.

15. As a condition of the 2001 Share Purchase Agreement, Mr. Eisses entered into an employment agreement with CPL (the "2001 Employment Agreement") whereby he was hired as President of CPL. The 2001 Employment Agreement had an initial three (3) year term, but could be renewed for additional one (1) year period thereafter. The 2001 Employment Agreement provided that Mr. Eisses would receive 6 months' base salary in the event that his employment was terminated by CPL without cause. Both parties understood that the 2001 Employment Agreement would continue in force until and unless a superseding employment agreement was executed.

16. In further consideration of the significant compensation that he received in connection with the 2001 Share Purchase Agreement, Mr. Eisses also executed a document pursuant to which he released all claims that he had or may have had against CPL in relation to his employment prior to 2001 (the "Release").

## 2004 Share Purchase Agreement

17. In or about June 2004, Groeneveld exercised its option to purchase the remaining 20% of CPL's shares from the plaintiff for approximately $1,241,000 (the "2004 Share Purchase Agreement"). As a result of the 2004 Share Purchase Agreement, CPL became a wholly-owned subsidiary of Groeneveld. As expected based on the historical bargaining styles of the parties, the negotiations concerning the 2004 Share Purchase Agreement were often contentious, with both parties seeking to maximize their gains and protect their interests.

18. In the 2004 Share Purchase Agreement, various ancillary agreements from the 2001 transaction were either superseded or expressly terminated. The 2001 Employment Agreement was not terminated.

19. Although the parties attempted to finalize a new employment agreement, that agreement was not finalized for execution at the time of the closing of the 2004 transaction. Rather than put off the closing, Mr. Eisses expressly agreed that, as a condition of the 2004 Share Purchase Agreement, he would negotiate in good faith a new written employment agreement with CPL, with a view to entering into it (and a

bonus agreement) on or before July 1, 2004. The parties understood that the 2001 Employment Agreement would govern until such time as a new written employment agreement was executed.

## The Plaintiff Failed to Act in Good Faith

20. The 2004 Share Purchase Agreement expressly contemplated that a new employment agreement would promptly be put into place. The parties exchanged draft employment agreements (both prior to and following the conclusion of the 2004 Share Purchase Agreement). It was intended that the new employment agreement would contain terms for increased responsibility and compensation for Mr. Eisses, but that it would otherwise contain provisions similar to the 2001 Employment Agreement, including without limitation the termination of employment provisions. However, in breach of his express agreement, Mr. Eisses would not execute a new employment agreement. Instead, he consistently found excuses for breaching his obligation to negotiate in good faith, or he simply ignored senior management's repeated requests that he sign the last draft that had been circulated.

21. As evidence of its own good faith and with a view to the fact that the parties had agreed to continue the employment relationship on the basis described in the foregoing paragraph, CPL assigned Mr. Eisses the agreed-upon additional responsibilities, and increased his wages.

22. At no point in the period leading up to the resignation of his employment in January 2007 did CPL ever implement a decrease in Mr. Eisses' compensation or a change in his responsibilities as alleged in the statement of claim. Furthermore, contrary to the allegations set forth in paragraphs 11, 12 and 36 of the statement of claim, compensation increases were in no way guaranteed. It is notable that the plaintiff now seeks the benefits of the employment agreement that had been prepared in 2004, but at the same time, seeks to avoid its obligations and limitations.

## Resignation of Employment

23. Contrary to the allegations contained in the statement of claim, in or about mid-2006, CPL's senior management discovered significant downward sales and other negative trends in CPL's North American business. Specifically, sales were below target and had been decreasing in both Canada and the United States. At the same time, CPL was incurring increased expenditures that were not subjected to appropriate managerial controls. In light of these trends, CPL began to devise a North American business plan whereby sales would be stabilized and certain expenses cut. CPL also determined that it would be beneficial to implement a decentralized business model within the North American market, consistent with its successful approach in other markets.

24. In or about November 2006, CPL's senior management and Mr. Eisses met in the Netherlands to further discuss CPL's financial performance and the going-forward plan to improve and streamline its North American business. During that meeting, Mr. Eisses agreed to the business plan proposed by the Company, and he agreed to prepare and submit a budget that reflected those principles. He also agreed that, in the future, the North American market would be re-organized, and that he would implement the decentralized business model in accordance with management instructions.

25. CPL's senior management met again with Mr. Eisses in or about January 2007. Upon reviewing Mr. Eisses' proposed budget, it became clear to CPL that he had wilfully ignored or disregarded the instructions that he received and that he had no intention of adopting and implementing the business plan to which he had agreed in November 2006. Contrary to their express instructions, Mr. Eisses' proposal included cost increases rather than the cost decreases that they had discussed and agreed upon. Further, the plaintiff's proposal was based on a centralized business plan, rather than the decentralized model as originally instructed and agreed.

26. Contrary to the allegations made in paragraphs 8 and 20 of the statement of claim, Mr. Eisses did not have autonomy to run the North American operations as he

wished. He had received almost $4,000,000 from the 2001 and 2004 transactions, and had thereby voluntarily given up the autonomy that he may have previously enjoyed in the years preceding those transactions. The plaintiff's blatant refusal to follow Company directions was a significant act of insubordination. When the Company discussed its concerns with Mr. Eisses, he told CPL that it should fire him.

27. CPL's senior management was extremely disappointed with Mr. Eisses' failure to follow its reasonable directions, particularly given his agreement with those directions just a few months earlier. As a result, Mr. Eisses was advised that, if he failed to implement the business plan discussed in November 2006, Groeneveld would become more involved in the North American market, which could lead to a commensurate decrease in Mr. Eisses' compensation. CPL's motivation in so advising Mr. Eisses was not to terminate his employment or to significantly decrease his compensation as alleged, but rather to encourage him to implement the preferred Groeneveld business model.

28. Mr. Eisses agreed that he would again meet with CPL's senior management in the Netherlands to further discuss the North American business plan and his continued employment with CPL. However, Mr. Eisses resigned his employment on January 28, 2007, without ever attending that meeting. At the time of his resignation, no decisions regarding any changes to Mr. Eisses' employment – with respect to his compensation or otherwise – had been made or implemented by the Company.

29. Contrary to the allegations made in paragraph 25 of the statement of claim, Mr. Eisses has been paid his salary for all days up to and including his last day of work, January 28, 2007. Further, Mr. Eisses has been paid all bonus amounts owed to him for work performed in 2004 and 2005. Any delay in the payment of such amounts was solely due to Mr. Eisses' refusal to enter into a written bonus plan until 2006. Bonus amounts for 2006 were not yet fully calculated at the time that this statement of defence was prepared. However, in light of the relevant financial results, the bonus claimed by the plaintiff in paragraphs 16 and 29 of the statement of claim are unwarranted and grossly inflated.

30. Contrary to the allegations of fact contained in paragraphs 26 and 27 of the statement of claim, CPL denies that supply costs to Groeneveld's European subsidiaries are in any way relevant to Mr. Eisses' entitlements under the bonus plan or otherwise. In any event, such costs were well-known to Mr. Eisses throughout his employment with CPL and his bonus package was tailored with a view to those known variables. CPL denies that there was any agreement to equalize supply costs between Groeneveld's North American and European subsidiaries, as alleged.

## The Plaintiff's Misconduct

31. Following his resignation, CPL discovered that Mr. Eisses had engaged in significant misconduct following the 2004 Share Purchase Agreement, in breach of his fiduciary and other obligations to the Company. It is now becoming clear to CPL that, once the plaintiff had sold his remaining equity ownership in CPL, he failed to exercise the care and diligence required of a senior executive. He behaved and treated CPL's assets with less care than the way he treated them when he and his family owned CPL.

32. During the period in which Mr. Eisses was a shareholder of CPL, he appeared to consistently institute and administer financial controls that demonstrated that he carefully guarded and protected the best interests of the Company. Following the sale of his stake in CPL, the plaintiff failed to implement such controls and even charged his personal expenses to the Company. In particular, CPL paid for certain personal expenses of the plaintiff, as well as those of his spouse and his children's nanny. CPL has also discovered that Mr. Eisses had appropriated CPL property, personnel and resources for his own personal use.

33. CPL understands that Mr. Eisses was heard stating that, now that Groeneveld was the sole owner of CPL, the "good times would roll." That attitude, the plaintiff's breach of obligations owed to the company and his misconduct, caused significant financial losses to CPL and unjustly enriched Mr. Eisses and his family. In the event that the plaintiff is any awarded damages in this proceeding, CPL claims a set off in respect of these amounts.

34. The plaintiff also engaged in self-dealing, and he ignored CPL policies and directions and failed to obtain required approvals and authorizations before he acted on behalf of the Company. Finally, Mr. Eisses neglected to oversee CPL's North American operations in a diligent manner, in large part by failing to create and implement appropriate controls to minimize expenses and safeguard Company property.

## Allegations of Constructive Dismissal

35. Contrary to the allegations in the statement of claim, Mr. Eisses was not "constructively dismissed." In fact, there were no changes to either his compensation or responsibilities before he resigned on January 28, 2007. Indeed, Mr. Eisses chose voluntarily, without warning, to resign his position before the meeting scheduled with senior management in the Netherlands during which he would have had an opportunity to address outstanding issues.

36. In all the circumstances, it is clear that Mr. Eisses no longer had any interest in working for CPL. He has used his dispute with his superiors regarding the direction of the North American business as an opportunity to claim significant dismissal damages. The allegation of constructive dismissal is not credible because it ignores the tenor and style of the parties' historical interactions and business dealings, and the fact that the parties were scheduled to continue their discussions in the Netherlands.

37. Even if CPL's actions in or around January 2007 resulted in the constructive termination of Mr. Eisses' employment, which is not admitted but rather is expressly denied, the plaintiff's acts of insubordination, as well as the misconduct that CPL uncovered following Mr. Eisses' resignation, constitutes just cause for the termination of his employment without notice or pay in lieu of notice.

38. In the further alternative, should it be found that CPL unlawfully dismissed Mr. Eisses, which is not admitted but rather is expressly denied, Mr. Eisses' entitlements are limited to those set out in the 2001 Employment Agreement as the parties intended that document to govern their employment relationship unless and until they executed a new written employment agreement. In any event, the Release precludes Mr. Eisses

from claiming any common law or other damages in relation to his pre-2001 employment with the Company.

39. In these circumstances, the plaintiff's claim for constructive dismissal damages based on 24 months' notice is unreasonable, excessive and unwarranted. Further, contrary to the claim in paragraph 37 of the statement of claim, the terms and conditions of the bonus plan do not permit any payment in lieu of bonuses in respect of any period following the end of Mr. Eisses' active employment.

## Conclusions

40. In light of the foregoing, CPL states that Mr. Eisses has not suffered any damages for which it is legally responsible, and it puts Mr. Eisses to the strict proof of any damages he claims to have suffered.

41. Similarly, CPL denies that its treatment of Mr. Eisses during his employment, the circumstances surrounding his dismissal, or any other of its conduct reflects bad faith warranting the extension of any notice period or an award of aggravated damages. CPL did not "unceremoniously drive" Mr. Eisses out of CPL, force him to accept a reduced compensation package, or treat him at any time in a highhanded, callous, or humiliating manner. Rather, it is Mr. Eisses who has breached his obligations to the Company.

42. CPL states that Mr. Eisses has not taken adequate steps to mitigate his damages or, in the alternative, that Mr. Eisses has mitigated any damages that otherwise may be found owing. In this regard, CPL states that the allegations of fact contained in paragraphs 32, 33 and 34 regarding Mr. Eisses' ability to obtain alternate employment are untrue and ignore the fact that Mr. Eisses is a highly sophisticated and experienced businessperson, with many ongoing business interests.

43. CPL therefore denies that the plaintiff is entitled to the relief claimed or to any relief, and requests that this action be dismissed with costs to the defendant on a substantial indemnity basis.

March 14, 2007

**BLAKE, CASSELS & GRAYDON LLP**
Barristers & Solicitors
Box 25, Commerce Court West
Toronto, Ontario M5L 1A9

Andrea York  LSUC#: 40728G
Tel: (416) 863-5263
Fax: (416) 863-2653

Solicitors for the Defendant

TO: **TEPLITSKY, COLSON LLP**
Barristers
Suite 200, 70 Bond Street
Toronto, Ontario M5B 1X3

Robert L. Colson (18717O)
David Greenwood (46888D)
Tel: (416) 365-9320
Fax: (416) 365-7702

Solicitors for the Plaintiff

| | |
|---|---|
| Court File No: 07-CV-327376PD2 | |
| | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>Proceeding commenced at Toronto |
| | **STATEMENT OF DEFENCE** |
| | **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers & Solicitors<br>Box 25, Commerce Court West<br>Toronto, Ontario M5L 1A9<br><br>Andrea York LSUC#: 40728G<br>Tel: (416) 863-5263<br>Fax: (416) 863-2653<br><br>Solicitors for the Defendant<br><br>Served on Fax: (416) 365-7702 |

JAN EISSES  and  CPL SYSTEMS CANADA, INC.
Plaintiff        Defendant