KENNETH L. BALCOM, Plaintiff, v. ROSENTHAL & COMPANY, ROSENTHAL COLLINS GROUP, FIRST AMERICAN DISCOUNT CORP., INDEX FUTURES GROUP, INC., JACK CARL/312 FUTURES, Defendants.

No. 96 C 6310

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1997 U.S. Dist. LEXIS 20842

December 31, 1997, Decided

January 2, 1998, Docketed

**DISPOSITION:** {*1} Defendants First American, Rosenthal and RCG's motion to dismiss or to stay the proceedings denied. Defendants Index and Jack Carl's motion to dismiss count III granted without prejudice.

**COUNSEL:** For KENNETH L BALCOM, plaintiff: William D. Anthony, Jr., Anthony & Associates, Linda Carol Frazier, Attorney at Law, Chicago, IL.

For ROSENTHAL & COMPANY, ROSENTHAL COLLINS GROUP, defendants: John J. Muldoon, James Martin Flynn, Attorneys at Law, Chicago, IL.
For FIRST AMERICAN DISCOUNT CORP., defendant: Jeffry Mark Henderson, Patrick Gerard King, Henderson and Lyman, Chicago, IL.
For INDEX FUTURES GROUP, INC., JACK CARL/312 FUTURES, defendants: Philip A. Tanzar, Attorney at Law, Chicago, IL.

**JUDGES:** BLANCHE M. MANNING, U.S. DISTRICT COURT JUDGE.

**OPINION BY:** BLANCHE M. MANNING

**OPINION:**
**MEMORANDUM AND ORDER**

This matter comes before the court on the three count complaint of plaintiff, Kenneth L. Balcom ("Balcom"), alleging breach of contract and breach of fiduciary duty by defendants Rosenthal and Company ("Rosenthal"), Rosenthal Collins Group ("RCG"), First American Discount Group Corporation ("First American"), and breach of fiduciary duty by defendants Index Futures Group, Inc. ("Index") {*2} and Jack Carl/312 Futures ("Jack Carl"). Defendants Rosenthal, RCG and First American move to dismiss Balcom's complaint pursuant to **Federal Rule of Civil Procedure 12(b)(1)** for lack of subject matter jurisdiction, pursuant to **Rule 12(b)(7)** for failure to join an indispensable party, and pursuant to the court's inherent powers to dismiss or stay Balcom's claims in light of a parallel action pending before a court in

England. Index and Jack Carl separately move to dismiss count III repeating the other defendants' argument under Federal **Rule 12(b)(7)**, as well as raising an independent argument in support of dismissing count III, pursuant to Federal **Rule 12(b)(6)**, for failure to state a cause of action. For the reasons stated below, the court denies defendants Rosenthal, RCG and First American's motion to dismiss and grants defendants Index and Jack Carl's motion to dismiss count III.

**BACKGROUND**

Following are the facts as alleged in the complaint. Balcom was a public commodity customer and resident of the County of Los Angeles, California. Defendants, Rosenthal, RCG, First American, Index, and Jack Carl were futures commissions merchants ("FCM") duly licensed by the Commodity {*3} Futures Trading Commission ("CFTC") and registered with the National Futures Association ("NFA") which maintains its principal place of business in Chicago, Illinois. An FCM is defined by the Commodities Exchange Act as an individual, association, partnership, corporation or trust engaged in soliciting or accepting orders for the purchase or sale of any commodity with the delivery on or subject to the rules of any contract market and that, in connection for the delivery on or subject to the rules of any contract market and that, in connection with such solicitation or acceptance of orders, accepts any money, securities or property to margin, guarantee, or secure any trades or contracts that result or may result therein. **7 U.S.C. § 1(12).** At all relevant times herein, each of the defendants was and is an agent, servant and employee of each of the other defendants.

On or about November 21, 1988, Balcom opened an individually held commodity account with defendants Rosenthal, RCG, and First American numbered 1-70001-15477 ("the Account"). That same day Balcom signed a limited power of attorney with privilege to withdraw securities and/or commodities, designating Dawn Hillier ("Hillier") {*4} as Balcom's agent and

attorney-in-fact for the purposes of buying, selling, and trading in stocks, bonds, securities, commodities and or contracts in accordance with the terms and conditions of the Account.

On May 21, 1991, the balance in the Account was $ 110,150.79. On or about June 27, 1991, Balcom revoked Hillier's limited power of attorney and notified defendant First American by telephone and by mail. On or about August 20, 1991, unbeknownst to Balcom, and pursuant to Hillier's instructions, defendants Rosenthal, RCG and First American transferred $ 110,150.79 from Balcom's individually held Account to defendants Index and Jack Carl, which in turn opened joint account, No. 48424 ("Joint Account"), in both Balcom's and Hillier's name. On or about August 23, 1991, Hillier instructed Index and Jack Carl to transfer $ 100,000 from the Joint Account to an account with the Barclay Bank PLC ("Barclays") of England in Hillier's own name. Apparently, Index and Jack Carl refused to transfer the funds from the Joint Account into Hillier's individual account. However, per Hillier's instructions, Index and Jack Carl subsequently transferred the same funds from the Joint Account to another {*5} joint account with Barclays in both Hillier's and Balcom's names.

Balcom later filed an action for conversion against Hillier in state court in California. Hillier apparently never responded and the court entered a default judgment against Hillier finding that she converted the $ 100,000. *See Balcom v. Hillier*, Case No. 68444 (Sup. Ct. Cal. July 13, 1993). In September 1996, Balcom filed the instant complaint with this court. In count I, he alleges that Rosenthal, RCG and First American each breached a fiduciary duty to Balcom by failing to verify Balcom's knowledge and approval for Hillier's requested transfer of the funds from the Account to the Joint Account. Count II alleges that Rosenthal, RCG and First American breached their customer agreement with Balcom by permitting Hillier's access to the Account. In Count III, Balcom alleges that Index and Jack Carl similarly breached a fiduciary duty owed to Balcom to notify him of any activity on the Joint Account. It further alleges that, in light of Hillier's effort to transfer the funds from the Joint Account to her own individual account, Index and Jack Carl should have suspected that Hillier's efforts to transfer the funds were {*6} part of a scheme to defraud Balcom.

Rosenthal, RCG and First American move to dismiss the complaint on three grounds. First, in their brief, they contend that Balcom has also filed a cause of action for conversion against Hillier in England. Assuming that he succeeds on this claim, they argue that it would not be reasonable to presume that Balcom

may obtain the $ 50,000 in damages necessary to provide this court with diversity jurisdiction. Second, defendants assert that Hillier is an indispensable party to this action and that, absent her joinder, the action must be dismissed. Third, they ask the court to exercise its inherent powers and abstain these proceedings pending the outcome of the allegedly previously filed similar action in England. Defendants Index and Jack Carl similarly contend that Hillier is an indispensable party to this action. Index and Jack Carl also assert that the complaint fails to state a claim for breach of fiduciary duty under Illinois law.

Defendants have attached to their motion to dismiss a copy of a document, apparently signed by Balcom himself, calling for the transfer of the fund from First American to Index. In his response brief, it is unclear whether {*7} Balcom disputes the authenticity of his signature on this document. His brief does point to the fact that the document is dated June 1, 1991, several weeks prior to his decision to withdraw Hillier's power of attorney, and over two months prior to Hillier's withdrawal of the funds.

DISCUSSION

In analyzing a motion to dismiss, the court will not dismiss a complaint unless it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). The court will accept all well-plead factual allegations in the complaint as true. *Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 414 (7th Cir. 1986). In addition, the court will construe the complaint liberally and will view the allegations in a light most favorable to the non-moving party, in this case the plaintiff, Balcom. *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993). However, the court is neither bound by the plaintiffs' legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claim. *Scott* {*8} *v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992).

I. *Subject Matter Jurisdiction.*

Because the complaint was filed prior to January 17, 1997, this court's diversity jurisdiction over Balcom's claims require that the amount in controversy under the claims exceeds the value of $ 50,000. **28 U.S.C. § 1332.** The amount in controversy to confer jurisdiction based on diversity is determined by a reasonable reading of the complaint where it is evident that the claim was made in good faith. *E.g., Horton v. Liberty*, 367 U.S. 348, 353, 6 L. Ed. 2d 890, 81 S. Ct. 1570 (1961). Courts should accept the good faith

allegation of the amount in controversy unless it appears to a "legal certainty" that a lesser amount is in controversy. *Cadek v. Great Lakes Dragaway, Inc.*, **58 F.3d 1209, 1212 (7th Cir. 1995)** (citations omitted). Although a challenge to jurisdiction technically imposes on the nonmovant the burden of demonstrating a reasonable probability that it may obtain the jurisdictional amount, as a practical matter, the movant retains the burden of showing the "legal certainly" that a lesser amount is really at issue. *Interpane Coatings v. Australia & New Zealand*, **732 {\*9} F. Supp. 909, 913-14 (N.D.Ill. 1990)**

Defendants First American, Rosenthal, and RCG assert that Balcom has not met his burden of proving the requisite statutory amount to confer federal jurisdiction. The defendants claim Balcom cannot recover the amount claimed because it is yet unclear whether he has suffered any damages. They note that the funds were transferred to a joint account that was in his name still held by Barclays. In addition, those funds are now in dispute in Balcom's alleged action against Hillier in England. Defendants argue that, if Balcom wins this action, he will have suffered no damages. Thus, he will regain the funds and have no damages remaining to recover. Defendants further argue that, if Balcom loses the English action, then the principles of comity between England and the United States would compel this court to dismiss his action because Hillier will have been adjudicated the owner of the funds which will have res judicata effect on the instant action.

As an initial matter, defendants have submitted absolutely no evidence in support of their contention that Barclays still holds the funds at issue, or that Balcom currently is pursuing a claim against Hillier. {\*10} Assuming these two assertions to be true, n1 however, defendants have still failed to demonstrate that, under the current circumstances, Balcom cannot obtain at least $ 50,000 in damages as a "legal certainty." Balcom's possible recovery against Hillier is too contingent a basis on which to find a "legal certainty" that he will regain the lost funds. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, **303 U.S. 283, 289, 82 L. Ed. 845, 58 S. Ct. 586 (1938)** (events occurring subsequent to the institution of the suit which reduce the amount recoverable below the statutory limit do not frustrate diversity jurisdiction); *see also Interpane*, **732 F. Supp. at 913** (defendants' possibility of successfully setting off damages insufficient to undermine diversity jurisdiction); *cf. Giffin v. Smith*, **256 F. Supp. 746 (D.C. Okl. 1966)** (successful affirmative defense of statute of limitations does not reduce amount in controversy as of filing of the complaint). Even if Balcom obtains a judgment against Hillier, the extent of his recovery remains

uncertain. Moreover, the complaint also seeks Balcom's reasonable and foreseeable costs pursuing the funds lost to Hillier. Accordingly, defendants' {\*11} motion to dismiss for lack of subject matter jurisdiction is denied.

- - -Footnotes- - -1

n1 Balcom does not appear to dispute either in his response brief.

- - -End Footnotes- - -

II. *Failure to Join Hillier.*

Federal **Rule 12(b)(7)** provides for the dismissal of an action for failure to join an indispensable party under Federal **Rule 19**. **Rule 19**, in turn, requires a three step inquiry: (1) whether the party is "necessary" to the suit; if she is "necessary," (2) whether joinder of the absent party is feasible; and, if it is not feasible, (3) whether the absent party is indispensable to the suit as provided in **Rule 19(b)**. *Moore v. Ashland Oil, Inc.*, **901 F.2d 1445, 1447 (7th Cir. 1990)**. As provided by **Rule 19(a)**, a party is necessary if her absence (a) renders the court unable to afford complete relief to the existing parties, (b) raises a substantial risk of harm to the absent party's interest in the litigation, or (c) raises a substantial risk of prejudice to the existing party such as through multiple liability or inconsistent obligations. **Fed.R.Civ.P.** {\*12} **19(a)**. Whether a party is indispensable under **Rule 19(b)** is a pragmatic and fact specific inquiry. *Southwestern Sheet Metal Joint Apprenticeship Training Fund v. Barsuli*, **950 F. Supp. 1406, 1414 (E.D. Wis. 1997)**; *see Filippini v. Ford Motor Co.*, **110 F.R.D. 131, 134 (N.D.Ill. 1986)**.

Defendants argue that Hillier is necessary to this action because her potential joint interest in the funds that were transferred into the Joint Account and then to Barclays. n2 In support, defendants cite to *Johnson v. Middleton*, **175 F.2d 535 (7th Cir. 1949)**, in which the Seventh Circuit stated that all persons with conflicting claims to the same fund are indispensable parties to an action that disposes of that fund. *Id.* at 538. However, Balcom's instant claims do not seek to dispose of the lost funds. *Cf. NationsBank v. Harris Bank Glencoe Northbrook*, **1993 U.S. Dist. LEXIS 7107, 1993 WL 179522 (N.D.Ill. May 25, 1993)** (finding holder of bank account necessary party to action seeking to impose a constructive trust on the account). Rather, they seek to hold the defendants liable for the alleged mismanagement and consequent loss of the funds. n3 Relatedly, the defendants have made no apparent effort to argue {\*13} that disposition of the instant claims would prejudice or otherwise impair Hillier's potential interest in the

transferred funds. Similarly, they do not argue that Hillier's absence prevents the court from providing complete relief to the parties.

- - -Footnotes- - -2

n2 Presumably, Hillier's joint interest in the funds would have arisen if Balcom had in fact authorized her transfer of the funds from his own Account with First American to the Joint Account with Index.

3

n3 Count I also seeks to hold Rosenthal, RCG and First American liable for breach of their written Customer Agreement by permitting Hillier to transfer the funds into the Joint Account.

- - -End Footnotes- - -

As defendants argue, Balcom's instant claims most likely will depend upon a factual disposition of Hillier's rights in the Account and Joint Account at the time of the challenged transfers: did Balcom authorize these transfers by signing the transfer document in June 1991 and, if so, had Balcom properly revoked that authorization? Defendants argue that this factual issue renders {\*14} Hillier "necessary" under **Rule 19(a)(2)(ii)** because it raises a substantial risk that the defendants may be subject to inconsistent obligations. While defendants correctly argue that they are not required to raise every conceivable potential action by Hillier against them to support a 12(b)(7) motion, they fail to present a single concrete example of such a suit. **Rule 19** directs courts to look to the practical likelihood of prejudice, not a mere theoretical possibility or conjecture. *See* Advisory Committee Note to **Rule 19;** *Sindia Expedition Inc. v. Wrecked & Abandoned Vessel*, **895 F.2d 116, 122 (3d Cir. 1990);** *Filippini*, **110 F.R.D. at 134** & 137; *Rippey*, **260 F. Supp. 704 at 708.** Defendants imply that they could be subject to a tort action by Hillier, presumably through a similar breach of fiduciary duty action. As defendants transferred the funds per Hillier's request, however, it is difficult to conceive of any potential damages that Hillier could seek other than any loss she suffers as a result of a judgment against her. But defendants do not indicate how such a judgment could give rise to their potential tort liability.

The court can conceive of some circumstances under {\*15} which the defendants may be subject to inconsistent adjudications. Defendants may be found liable under the instant claims. As noted, such success would probably require a factual finding that Hillier

was not authorized to transfer the funds. Although the court does not address the merits of such an action, defendants might in turn seek reimbursement for any liability arising from this judgment through a suit against Hillier under fraud or implied indemnity. As Hillier was not a party to the first action, she would not be bound by its findings. Thus, in contradiction to Balcom's suit against the defendants, the trier of fact may find that Hillier was authorized to transfer the funds. Although this may appear unfair to the defendants, **Rule 19(a)** protects against inconsistent obligations, not inconsistent results. *Bedel v. Thompson*, **103 F.R.D. 78, 81 (S.D.Ohio 1984);** *see Sindia*, **895 F.2d at 123;** *Evergreen Marine Corp. v. Welgrow Int'l Inc.*, **942 F. Supp. 201, 206 (S.D.N.Y. 1996).** Defendants' inability to collect against Hillier affects Hillier's obligations, not the obligations of the defendants. *See also Janney v. Shepard Niles, Inc.*, **11 F.3d 399, 411 (3d Cir. 1993)** {\*16} (fact that defendant may lose subsequent contribution claim against joint tortfeasor in contradiction to plaintiff's judgment does not render joint tortfeasor a necessary party). Consequently, the defendants have failed to satisfy their burden of demonstrating that, as a practical matter, they may be subject to inconsistent obligations to Hillier.

As to the possibility that Balcom could obtain double recovery, defendants cite to no precedent indicating that Balcom is not entitled to pursue his claim for damages arising from the defendants' alleged negligence while also pursuing recovery for overlapping losses against Hillier. *See also Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, **844 F. Supp. 1271, 1275 (N.D.Ill. 1994)** (plaintiffs' claim against principal for unpaid debt does not render the principle indispensable to a claim against a guarantor). If Balcom first recovers on his conversion claim against Hillier, the defendants may demonstrate this recovery and request that it be taken into account in computing any damage award arising in the instant action.

III. *Action Pending in Foreign Jurisdiction.*

A district court is empowered to dismiss a federal suit "whenever {\*17} it is duplicative of a parallel action already pending in another federal court." In the interests of international comity, this principal also applies to parallel actions pending in courts in a foreign country. *Ingersoll Mill Mach. Co. v. Granger*, **833 F.2d 680, 684 (7th Cir. 1987);** *Brinco Mining Co. v. Fed. Ins. Co.*, **552 F. Supp. 1233, 1240 (D.C. 1982).** *But see also Philips Medical Sys. Int'l, B.V. v. Bruetman*, **8 F.3d 600, 604-05 (7th Cir. 1993)** (indicating that lesser weight should be granted comity to foreign courts than to state courts). Defendants ask

the court to exercise its inherent powers to either dismiss or stay Balcom's instant action in light of his previously filed action in England against Hillier. Although defendants concede that the parties are somewhat distinct between these actions, they contend that each of Balcom's actions are still parallel because they revolve around an identical issue: the respective rights of Balcom and Hillier to the fund.

An action is "parallel" to another action when "substantially the same parties are contemporaneously litigating substantially the same issues in another forum." *Ludgate Ins. Co. v. Becker*, 906 F. Supp. 1233, {*18} 1242 (N.D.Ill.) (quoting *Caminiti and Iatarola v. Behnke Warehousing*, 962 F.2d 698, 700 (7th Cir. 1992) (citations omitted) (applying doctrine under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976))). Even where the parties may appear formally distinct, the actions may be parallel where the parties are "substantially the same." *See Caminiti*, 962 F.2d at 700-01. But courts have required some legal identity of interest to find such substantial similarity. *See id.* (defendant from first case owned one quarter of defendant in second case, while second defendant's reimbursement of loans to first defendant depended on first case); *Continental Time Corp. v. Swiss Credit Bank*, 543 F. Supp. 408, 410 (S.D.N.Y. 1982) (dismissing federal action where plaintiff is successor-in-interest of plaintiff in parallel litigation against the same defendant in foreign court).

Defendants do not provide any argument for such legal identity of interests between themselves and Hillier. Defendants do argue that both they and Hillier hope to demonstrate that Hillier's transfers were legally authorized by Balcom. Through the doctrine {*19} of issue preclusion, either Hillier or the defendants may be able to use such a finding in the other suit in order to preclude Balcom from arguing to the contrary in their own suit. But the potential defensive use of issue preclusion against Balcom does not establish that Hillier and the defendants are substantially the same parties; It merely reflects the fact that the actions share a single common party, Balcom, and arise in part from the same transaction. Neither the defendants nor Hillier have any interest in the other.

Even assuming that the suits are parallel, a district court generally should exercise its jurisdiction over an action even where identical subject matter is concurrently before a foreign court. *See Ingersoll Mill*, 833 F.2d at 684; *Ludgate*, 906 F. Supp. at 1242; *Laker Airways Ltd. v. Sabena*, 235 U.S. App. D.C. 207, 731 F.2d 909, 926-27 (D.C.Cir. 1984). The court should look to the factors enunciated in *Colorado River* in order to determine if such extraordinary

circumstances exist. *See Ingersoll*, 833 F.2d at 685; *Brinco*, 552 F. Supp. at 1240. These include the desirability of avoiding duplicative litigation, the inconvenience of the domestic {*20} forum, the governing law, the order in which jurisdiction was obtained in each forum, the relative progress of each proceeding, and the contrived nature of the domestic claim. *See, e.g., Ludgate*, 906 F. Supp. at 1242.

Although there may be some possibility of duplicative litigation over the issue of Hillier's actual authority to transfer the funds, as noted, the instant claim resolves around the distinct legal and factual issues of the defendants' duty and conduct. Save for Hillier's flight to England, the conveniences of witnesses and evidence involved in Balcom's claims against the defendants strongly favor the local forum. It also seems clear that England will not provide the governing law. While it appears that the English action was filed first, defendants have made no effort to identify how much sooner this action was filed. Similarly, defendants ᵢ have provided no evidence indicating that the action has proceeded beyond its incipient stages other than the fact that Balcom filed his claim overseas earlier. In sum, on the present record, these factors do not favor a dismissal or a stay of the instant action.

IV. *Statement of a Claim Against Index and Jack Carl.*

The {*21} complaint alleges that Index and Jack Carl breached their fiduciary duty to Balcom by transferring the funds from the joint account without first contacting Balcom. Index and Jack Carl note that the allegations clearly reveal that the only account for which they were responsible was jointly owed by Balcom and Hillier; the funds had been transferred into an account set up in both of their names. They argue that Balcom has failed to allege or point to any portion of the terms of the account indicating that either party to the account did not have the authority to transfer the funds. In the absence of any such terms, Index and Jack Carl contend that Index simply had no duty to investigate or require Balcom's consent before carrying out Hillier's directive. *See Wood v. Jack Carl Associates, Inc.*, 782 F.2d 83, 86-88 (7th Cir. 1986).

In *Wood*, the Seventh Circuit found that a broker did not breach its duty to a party to joint account by permitting the other party to transfer the entire funds into a separate joint account. However, *Wood* did not state that no such duty could ever exist. Rather, the court explained that the plaintiff had failed to either direct the court to any {*22} Illinois law indicating such a duty or pleading any circumstances indicating negligence. Thus, *Wood* indicated that a duty to not pay the funds of a joint account to a single holder may arise where the broker "has reasons to believe that it is

assisting in a scheme" to defraud the other account holder. *Id.* at 88; *see also Leuzinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 396 S.W.2d 570 (Mo. 1965) (imposing duty on broker to inform joint account holder where it knows of circumstances that would lead an ordinary careful and diligent person to believe that the account is being wrongfully converted); *Roth v. Roth*, 571 S.W.2d 659 (Mo.App.1978) (finding circumstances raising such a duty).

Balcom argues that the complaint pleads such facts that provided Index with reason to believe that it was assisting Hillier in a scheme to defraud Balcom. These circumstances include Hillier's swift action, before any trading, to remove the bulk of the funds from the joint account overseas. In addition, Balcom notes that Hillier first attempted to transfer the funds into her own individual account in violation of federal regulations. *See; cf. Roth*, 571 S.W.2d at 669 (broker's {*23} transferring funds to single account contributed to circumstances supporting breach of duty).

Although the complaint provides facts beyond those in *Wood*, it still fails to plead circumstances raising a duty on the part of Index to refrain from paying over the funds. A copy of a confirmation by Hillier, attached as an exhibit to the complaint, indicates that Index was aware that the funds were transferred from an account in Balcom's name only. But the complaint fails to plead any facts that should have raised Index's suspicions that Balcom had not approved of Hillier's transferring the funds to a joint account. In addition, Balcom points to no Illinois case law or other precedent indicating that the swift removal of funds constitute particularly suspicious circumstances. Rather, precedent has recognized that "commodities speculation is highly risky and customers frequently get cold feet and withdraw." **782 F.2d at 87**.

With regard to Hillier's initial effort to transfer the funds to her own account, *Wood* indicated that paying out the proceeds to the account of a single holder was not sufficient to the reasonable suspicions of the broker. Balcom has made no effort to argue that {*24} the customer agreement creating the Joint Account at Index precluded the broker from paying out the proceeds to one account holder without the other's consent. In his response brief, Balcom states that such a transfer would have been illegal, but mysteriously provides no citation. In addition, the court fails to see how it may consider this effort by Hillier sufficiently suspicious to impose a duty upon Index and Jack Carl to immediately contact Balcom in light Wood's holding that such a transfer is generally proper. *See* **782 F.2d at 87-88**.

In addition, Balcom contends that the duty Index and Jack Carl owed to immediately contact him also arises from the National Futures Association's requirement that a trader know its customer and that approval of the transfer in light of the circumstances constitutes a breach of that duty. In particular, Balcom implies that Index should have investigated the source of the funds and discovered that Balcom had previously revoked Hillier's power of attorney. However, Balcom cites to no authority other than to rules themselves in support of this proposition. The cited rules only provide that an FCM is required to obtain only certain basic information {*25} about its customers. *See* NFA Rule 2-30. This information does not include any investigation of a customer's previous financial activity at a prior brokerage firm. *See id.* In fact, the rules permit the FCM to merely rely upon the customer for this information and engage in no verification effort. *Id.*

Balcom also argues that section 4d of the Commodity Exchange Act prohibits brokers from resolving a conflict between the interests of a holder of a joint account by pursuing the interests of one holder to the detriment of the other holder. *See Chapman and Kohn v. E.F. Hutton & Co., Inc.*, 1987 CFTC LEXIS 222, Comm. Fut. L. Rep. (CCH) P 23,938 (CFTC 1982). However, the complaint does not plead facts giving rise to an inference that Index intentionally pursued Hillier's interests in conflict to Balcom's interests. In particular, the allegations of the complaint do not indicate that Index received any information or communication from Balcom that opposed such a transfer. *Cf. id.* (finding possible violation of the statute where each joint account holder had given contradictory instructions). Even if, despite *Wood*, a transfer to an individual account would constitute a violation of section {*26} 4d, the complaint alleges Index did not engage in this action but only transferred the funds into another joint account.

For these reasons, the Index and Jack Carl's motion to dismiss count III is granted.

## CONCLUSION

For the reasons set forth above, defendants First American, Rosenthal and RCG's motion to dismiss or to stay the proceedings is denied. However, defendants Index and Jack Carl's motion to dismiss count III is granted without prejudice. Balcom may replead count III in order to cure the defect identified in the order above, consistent of course with his obligations pursuant to Rule 11. Should Balcom fail or decline to replead within 14 days of the date of entry of this order, the dismissal shall be with prejudice.

ENTER:

BLANCHE M. MANNING

U.S. DISTRICT COURT JUDGE

DATE: *December 31, 1997*

SABRE, INC., Plaintiff, VS. AIR CANADA, INC., Defendant.

NO. 3-02-CV-2016-L

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

2002 U.S. Dist. LEXIS 23697

December 9, 2002, Decided

December 9, 2002, Filed

**DISPOSITION:** {*1} Magistrate recommends that this Defendant's motion to dismiss for forum non conveniens or in alternative to stay on grounds of international abstention is denied.

**COUNSEL:** For SABRE INC, plaintiff: John R Crews, Attorney at Law, Jon G Shepherd, Attorney at Law, Gibson Dunn & Crutcher, Dallas, TX USA.

For AIR CANADA INC, defendant: Stephen D Susman, Attorney at Law, 2ADDS, Harry P Susman, Attorney at Law, Suyask Agrawal, Attorney at Law, Susman Godfrey, Houston, TX USA.

**JUDGES:** JEFF KAPLAN, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JEFF KAPLAN

**OPINION:**
**FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

Defendant Air Canada, Inc. ("Air Canada") has filed a motion to dismiss for *forum non conveniens* or, in the alternative, to stay on grounds of international abstention. For the reasons stated herein, the motion should be denied.

I.

Plaintiff Sabre, Inc. ("Sabre") owns and operates a state-of-the-art computerized global distribution system ("GDS") that displays and distributes information on air and ground transportation, lodging, and other travel-related services to more than 60,000 subscribers worldwide. (Plf. App. at 14, P2). These subscribers, who are typically travel agents, {*2} use the Sabre GDS to review travel availability, make reservations, and issue tickets on participating domestic and foreign air carriers. (*Id.*). The carriers contract with Sabre and pay a fee for each booking made through the GDS. (*Id.; see also* Plf. Orig. Compl. at 2, P 6).

On or about July 31, 1990, Air Canada entered into a Participating Carrier Distribution and Services Agreement ("PCA") with American Airlines, Inc., Sabre's predecessor-in-interest. (Plf. App. at 14-15, P3; Plf. Orig. Compl. at 3, P 9). The PCA was amended by the parties in 1996 and 1998 ("Addendums"). (Def. App., Exhs. B & C). Four contractual provisions are relevant to the instant case. First, section 2.1 of the PCA obligates Air Canada, at its own cost and subject to documented technical limitations, to:Use reasonable efforts to coordinate its reservations services with Sabre to provide as advantageous and uniform reservations services to all Sabre subscribers as it provides through any other GDS. In addition, any improvements, enhancements, or additional functions to [Air Canada's] reservations services offered to end users of any GDS in a specific country will after appropriate negotiation {*3} with [Sabre], be offered by [Air Canada] to SABRE subscribers in that country. It is understood that the terms and conditions offered to SABRE subscribers will be no less favorable to subscribers of such other GDS. Provided, however, that the cost to [Air Canada] must not be substantially greater on a per unit cost basis . . . than the cost incurred by providing such enhancements, or additional functions to the other GDS. Such services shall include, but are not limited to, ticketing capability, passenger information, interim schedule change data, fare data, fare quotations, and procedural information. Seat availability on each flight will be on a segment or first closing basis, and shall be in accordance with the provisions of Article III of this Agreement. n1(Def. App., Exh. A at 3, § 2.1). The second relevant provision is section 1.2 of the PCA, which requires Sabre to "maintain and operate SABRE in accordance with applicable GDS Rules." (*Id.*, Exh. A at 1, § 1.2). The term "GDS Rules" is defined in a schedule to the PCA as "rules and regulations established by governmental entities for the operation of GDS', including those in effect in the United States, Canada {*4} and the European Community." (*Id.*, Exh. A at 12, § 1.19). Third, and perhaps most importantly, the 1998 Addendum to the PCA provides

that Air Canada "shall make available through Direct Connect Air the schedule and availability display used by [Air Canada's] reservations personnel." (*Id.*, Exh. C at 3, § 5(e)). n2 Finally, the parties agreed that the PCA "and any disputes arising hereunder will be governed by the laws of the United States and the State of Texas without regard to its conflict of laws rules." (*Id.*, Exh. A at 14, § 2.10).

- - -Footnotes- - -1

n1 Article III of the PCA describes the levels of participation available to participating carriers. Air Canada opted for "Full Availability." Under this option, Air Canada agreed to provide Sabre with "all segment availability status changes on all flights." (Def. App., Exh. A at 6-7, § 3.1).

2

n2 "Direct Connect Air" is a premium level service that allows Sabre to provide subscribers with instantaneous, transparent retrieval of information from the participating carrier's internal reservation system. (Def. App., Exh. C at 1, § 1).

- - -End Footnotes- - -

{*5} In November 2001, Air Canada began to offer low-cost, "no frills" service on certain flights primarily between Canadian destinations. (Def. App., Exh. E at 2, § 13). These flights, which are operated under the brand name "Tango," can be booked only through the Air Canada website or through a designated Tango call center. (*Id.*, Exh. E at 2, § 14). Tango flights are not available through Sabre or any other GDS operator. (*Id.*, Exh. E at 2, §§ 14-15). This innovative attempt by Air Canada to reduce operating costs has prompted an all-out war between the parties on two fronts.

On September 17, 2002, Sabre sued Air Canada for breach of contract in the United States District Court for the Northern District of Texas. Although Sabre filed suit first, a summons was not issued until September 26, 2002--the day after Air Canada filed a declaratory judgment action in the Superior Court of Quebec, District of Montreal. (*Id.*, Exh. E). The Canadian action seeks an interpretation of the Computer Reservation Systems ("CRS") Regulations contained in the Canadian Aeronautics Act. *See Aeronautics Act*, R.S.C. 1985, ch. A-2. In particular, section 6 of the CRS Regulations provides: {*6}

An obligated carrier shall provide to all systems that are operated in Canada, on the same basis and at the same time as such information is provided to any

system, complete, up-to-date and accurate information concerning its schedules, fares, rules and availability in all classes of service.

SOR/95-275, § 6 (Jun. 6, 1995). Section 8(1) of the CRS Regulations further provides:

At the request of a system vendor, every obligated carrier shall

(a) participate in a comparable manner in the distribution facilities of all systems that are operated in Canada; and

(b) provide access links to the levels of "look and book", last seat availability, seat selection and the issuing of boarding passes.

*Id.*, § 8(1). Air Canada maintains that its failure to offer Sabre subscribers reservation services for Tango flights does not violate the Canadian CRS Regulations or the PCA because such services are not offered to other GDS operators. The Canadian action seeks a judicial declaration to that effect. (Def. App., Exh. E at 3).

Air Canada now moves to dismiss Sabre's first-filed breach of contract action for *forum non conveniens*. According to Air Canada, the {*7} Superior Court of Quebec is an available and adequate forum to resolve this dispute and the relevant private and public interest factors warrant dismissal of this case. Alternatively, Air Canada moves to stay the proceedings in this court on grounds of international abstention. The motion has been fully briefed and argued by the parties and is ripe for determination.

II.

Air Canada readily concedes that both jurisdiction and venue are proper in the United States District Court for the Northern District of Texas. (Def. Mot. at 2). n3 Nevertheless, it seeks dismissal on the grounds of *forum non conveniens*.

- - -Footnotes- - -3

n3 Federal jurisdiction is proper because Sabre is a citizen of Texas, Air Canada is a citizen of Quebec, Canada, and the amount in controversy exceeds $ 75,000, exclusive of interests and costs. (Plf. Orig. Compl. at 1, §§ 1-2). *See* **28 U.S.C. § 1332(a)(2)**. Venue properly lies in the Northern District of Texas because Air Canada transacts business here. *See id.* § 1391(c).

- - -End Footnotes- - -

{*8} A.

"The doctrine of *forum non conveniens* presupposes at least two forums where the defendant is amenable to process and simply furnishes criteria for choice between them." *McLennan v. American Eurocopter Corp., Inc.*, 245 F.3d 403, 424 (5th Cir. 2001), *quoting Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 342 (5th Cir. 1999). The threshold inquiry in a *forum non conveniens* analysis is the existence of an alternative forum that is both available and adequate. *Gonzalez v. Chrysler Corp.*, 301 F.3d 377, 379 (5th Cir. 2002); *Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1550 (5th Cir.), *cert. denied*, 502 U.S. 963, 116 L. Ed. 2d 449, 112 S. Ct. 430 (1991). If an alternative and adequate forum exists, the court must determine whether relevant private and public interest factors warrant dismissal. *Gonzalez*, 301 F.3d at 380; *Baris*, 932 F.2d at 1550-51. As movant, Air Canada bears the burden of proof on all elements of this analysis. *Seguros Comercial Americas S.A. De C.V. v. American President Lines, Ltd.*, 933 F. Supp. 1301, 1307 (S.D. Tex. 1996). Only "rare circumstances" {*9} justify relinquishing federal jurisdiction in favor of another forum. *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir. 2001), *quoting Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706, 722, 116 S. Ct. 1712, 1724, 135 L. Ed. 2d 1 (1996).

B.

The first inquiry is whether an available and adequate alternative forum exists. An available forum is one that has jurisdiction over the entire case and all the parties. A forum is adequate when the parties are not deprived of their remedies or treated unfairly, even though they may not enjoy the same benefits as they might enjoy in an American court. *See Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 835 (5th Cir.), *cert. denied*, 508 U.S. 973, 113 S. Ct. 2963, 125 L. Ed. 2d 663 (1993).

Air Canada has adduced evidence through the affidavit of Pierre Lefebvre, a Canadian lawyer, that Canada is an adequate and available forum for the resolution of this dispute. Sabre does business throughout Canada and maintains an office in Ontario. As a result, a Canadian court would have jurisdiction over the entire case and all the parties. The remedies and procedural safeguards {*10} afforded by the Canadian judicial system largely mirror those available in American courts. Parties may summon witnesses to testify at trial or a hearing under threat of imprisonment if they fail to appear. The testimony of witnesses located outside the court's jurisdiction may be obtained through letters rogatory. (*See* Def. Mot. at 13 & Exh. F at 2, PP 8-9). Sabre does not offer any argument, much less evidence, that Canada is not an adequate and available forum. Accordingly, the court

must turn to the second step of the *forum non conveniens* analysis--whether private interest factors weigh in favor of dismissal.

C.

There are four private interest factors that must be considered: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for the attendance of unwilling witnesses and the costs associated with the production of willing witnesses; (3) the enforceability of a judgment if one is obtained; and (4) any other practical problems that may affect the ease, expediency, and expense of trial. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S. Ct. 839, 843, 91 L. Ed. 2d 1055 (1947). The choice of an American forum {*11} by a United States citizen, although not dispositive, should be given deference in this analysis. *See Koster v. Lumbermen's Mutual Casualty Co.*, 330 U.S. 518, 524, 67 S. Ct. 828, 831-32, 91 L. Ed. 1067 (1947); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 290 (5th Cir. 1989). As the Supreme Court stated in *Koster*:

Where there are only two parties to a dispute, there is good reason why it should be tried in the plaintiff's home forum if that has been his choice. He should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems. In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown.

*Koster*, 67 S. Ct. at 831-32.

1.

As {*12} a preliminary matter, Air Canada argues that Sabre should not benefit from the normal presumption accorded to a plaintiff's choice of forum because this lawsuit, filed days before Air Canada's declaratory judgment action, "simply represents an effort to manipulate procedure rules." (Def. Mot. at 8). The court disagrees. Unlike the cases cited by Air Canada in its motion, Sabre did not file an anticipatory declaratory judgment action solely to secure a favorable forum. *See, e.g.* *Pacific Employers Insurance Co. v. M/V Capt. W.D. Cargill*, 751 F.2d 801, 804 (5th Cir.), *cert. denied*, 474 U.S. 909, 106 S. Ct. 279, 88 L. Ed. 2d 244 (1985); *Buzas Baseball, Inc. v. Board of Regents of University System of Georgia*, 1999 U.S. App. LEXIS 21630, 1999 WL

682883 at *3 (10th Cir. Sept. 2, 1999). If anything, it was Air Canada who filed what it believed to be a preemptive declaratory judgment action in Canada.

Nor is the court disturbed by the nine-day delay in serving Air Canada with a summons and complaint. As Sabre's counsel explained at oral argument, the parties were engaged in settlement discussions during this period. Neither party disclosed its plans to file suit so {*13} as not to jeopardize these negotiations. Unfortunately for Air Canada, Sabre got to the courthouse first. Sabre's motives in filing suit and not serving process are no more sinister than those of Air Canada. Consequently, Sabre's choice of forum is entitled to some deference.

2.

The first relevant private interest factor is the relative ease of access to sources of proof. Air Canada argues that, because this is a dispute over whether it is obligated by the PCA and Canadian CRS Regulations to submit the Tango flight inventory to Sabre, "the proof is overwhelmingly in Canada." (Def. Mot. at 11). In support of its position, Air Canada lists seven employees located in either Toronto or Montreal who have knowledge of the Air Canada-Sabre relationship and Tango. (*Id.* at 12). Air Canada further argues that all documents related to Tango operations, including bookings, reservations systems, flight schedules and fare data, are located in Canada. (*Id.*). Finally, to the extent that the parties may rely on experts to testify about the relevant market effects on the Canadian air transportation industry, Air Canada suggests that such experts will come from Canada. (*Id.* at 12-13). Sabre {*14} counters with a list of 11 of its own employees--all located in Texas--who may be potential witnesses. (Plf. Resp. at 7 & App. at 15-16, P 5).

Despite its conclusory assertions, Air Canada has not outlined the substance of the expected testimony of its witnesses or explained how their testimony is relevant to any of the issues in this case. A party seeking dismissal on grounds of *forum non conveniens* "must provide enough information to enable the District Court to balance the parties' interests." *Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unterweser, A.G.,* 955 F.2d 368, 371 (5th Cir. 1992), *quoting Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 258, 102 S. Ct. 252, 267, 70 L. Ed. 2d 419 (1981). Merely listing witnesses does not assist the court in balancing the interests of the parties. Moreover, where key witnesses are employees of the party seeking dismissal, their convenience should be entitled to less weight because the party is able to compel their attendance at trial. *See Dupre v. Spanier Marine Corp.,* 810 F. Supp. 823, 825 (S.D. Tex. 1993) (applying rule in the context of a motion to transfer

venue under 28 U.S.C. § 1404 {*15} (a)). The court is unable to conclude, based on the scant evidence presented by Air Canada, that this factor weighs in favor of dismissal.

3.

The other private interest factors are mostly neutral. Both Canadian and American courts provide for compulsory process to secure the attendance of unwilling witnesses. The costs associated with the production of willing witnesses located in the United States for a trial in Canada are no greater than those associated with the production of Canadian witnesses for trial in the United States. If anything, this factor militates against dismissal, as Air Canada has regularly scheduled service to Dallas/Fort Worth International Airport and should incur no significant expense in transporting its witnesses to Texas. Nor is it any more difficult to enforce a Canadian judgment in an American court than *vice versa.* Finally, neither party has offered evidence of any practical problems that would affect a trial in either Canada or the United States. The court therefore concludes that the private interest factors do not support the dismissal of this suit.

D.

If the court determines that dismissal is not warranted by the private interest factors, it {*16} must consider the relevant public interest factors. *See Gonzalez,* 301 F.3d at 380. The public interest factors include: (1) administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies resolved at home; (3) the proposed alternative forum's familiarity with the law that governs the action; (4) the avoidance of unnecessary problems with conflicts of law or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *Gulf Oil,* 67 S. Ct. at 843; *McLennan,* 245 F.3d at 424. The central question to be resolved in analyzing these factors is whether the case has a general nexus with the forum sufficient to justify the forum's commitment of judicial time and resources. *See Robert v. Bell Helicopter Textron, Inc.,* 2002 U.S. Dist. LEXIS 7232, No. 3-01-CV-1576-L, op. at 11 (N.D. Tex. Apr. 23, 2002) (Kaplan, M.J.), *rec. adopted,* 2002 U.S. Dist. LEXIS 9904, 2002 WL 1268030 (N.D. Tex. May 31, 2002) (Lindsay, J.); *Seguros,* 933 F. Supp. at 1313.

1.

Air Canada offers a variety of reasons why the public interest factors support dismissal in favor of a Canadian {*17} forum. The most compelling argument, at least superficially, is that this case involves novel questions of Canadian regulatory law that should be decided by a Canadian court. Although

the PCA is governed by Texas law, Air Canada contends that "Canadian regulations govern the more discrete issues at the core of the disagreement." (Def. Mot. at 19). The regulations at issue are the Canadian CRS Regulations contained in the Aeronautics Act. Succinctly stated, Air Canada maintains that it is not in violation of the CRS Regulations, and therefore has not breached the PCA, by failing to offer Sabre subscribers reservation services for Tango flights because such services are not offered to other GDS operators. n4

- - -Footnotes- - -4

n4 To the extent that Sabre maintains that the Canadian CRS Regulations are not part of the PCA, it is mistaken. *See American Trans Air, Inc. v. American Airlines, Inc.*, **1998 U.S. Dist. LEXIS 13853, 1998 WL 567835** at *11 (S.D. Ind. Aug. 10, 1998) (holding that unambiguous language in standard contract with participating carriers requiring American Airlines to "maintain and operate SABRE in accordance with GDS Rules" incorporated Department of Transportation Rules and Regulations).

- - -End Footnotes- - -

{*18}  Without prejudging the merits of this argument, the court questions whether the Canadian CRS Regulations are relevant to Sabre's breach of contract claim. The regulations cited by Air Canada govern *carriers*, not GDS operators like Sabre. By contrast, section 1.2 of the PCA requires *Sabre,* not *Air Canada,* to "maintain and operate SABRE in accordance with applicable GDS Rules." (Def. Mot., Exh. A at 1, § 1.2). Air Canada has failed to explain how this contractual provision, or any Canadian regulation, affects its obligation to "make available through Direct Connect Air the schedule and availability display used by [its] reservations personnel." (*Id.*, Exh. C at 3, § 5(e)). There may be a legitimate issue as to whether Air Canada is required to offer Sabre subscribers the same reservation services for Tango flights as is made available through the Air Canada website or designated Tango call centers. However, in the context of this lawsuit, that issue must be decided under the terms of the PCA which is governed by Texas law. Stated differently, even if Air Canada is found not to be in violation of the Canadian CRS Regulations by failing to offer Sabre subscribers reservation {*19} services for Tango flights, that does not necessarily mean that it has no obligation to do so under the terms of the PCA and Addendums.

2.

Air Canada further argues that the outcome of this case could undermine the viability of Tango as a low-cost travel alternative and potentially disrupt Canadian air travel. Once again, no evidence is submitted in support of that assertion. Assuming *arguendo* that this factor weighs in favor of dismissal, the Fifth Circuit has counseled against placing too much emphasis on any single factor in performing a *forum non conveniens* analysis. *See Dickson Marine,* **179 F.3d at 342** (citing cases). All the other public interest factors are either neutral or favor retaining jurisdiction in Texas.

In particular, the court is not convinced that the Canadian declaratory judgment action can be heard and determined before Sabre's breach of contract case. Although Air Canada had hoped to have its motion for declaratory relief resolved in a matter of months, Sabre has recently filed a motion to dismiss or stay that action which must be decided before the motion for declaratory judgment is heard. There is no reliable evidence as to when a {*20} final ruling will be forthcoming. (*See* Plf. Supp. App. at 2). By separate order this date, the court has put Sabre's breach of contract case on an accelerated schedule for resolution by way of cross-motions for summary judgment or, if necessary, trial. *See* INIT. SCH. ORDER, 12/09/02. Therefore, court congestion is, at best, a neutral factor.

The court also notes that Sabre has entered into similar participation agreements with nearly 400 other carriers. (Plf. App. at 15, P 4). All those agreements are governed by Texas law. (*Id.*). Surely there is a public interest in having the provisions of the PCA interpreted uniformly by a court that is at home with the law that governs the contract. n5

- - -Footnotes- - -5

n5 The final public interest factor--the unfairness of burdening citizens in an unrelated forum with jury duty--is irrelevant, as Canada does not have jury trials for civil disputes. *See generally, Piper Aircraft,* **454 U.S. 235, 102 S. Ct. 252, 264 n. 18, 70 L. Ed. 2d 419** (noting that jury trials are unavailable in many countries).

- - -End Footnotes- - -

{*21}  For all these reasons, Air Canada's motion to dismiss should be denied.

III.

In the alternative, Air Canada moves to stay this action on grounds of international abstention. The doctrine of international abstention allows a court to stay or dismiss an action where parallel proceedings are pending in the court of a foreign nation. *See Finova Capital Corp. v. Ryan Helicopters USA, Inc.*, 180 F.3d 896, 898 (7th Cir. 1999); *Posner v. Essex Insurance Co., Ltd.*, 178 F.3d 1209, 1222-24 (11th Cir. 1999); *Boushel v. Toro Co.*, 985 F.2d 406 (8th Cir. 1993). Among the factors relevant to determining whether to grant such a stay are: (1) the similarities of the parties and issues involved in the foreign litigation; (2) the promotion of judicial efficiency; (3) the adequacy of relief available in the alternative forum; (3) the fairness to and convenience of the parties, counsel, and witnesses; (4) the possibility of prejudice to any of the parties; and (5) the temporal sequence of the filing of the actions. *See EFCO Corp. v. Aluma Systems, USA, Inc.*, 983 F. Supp. 816, 824 (S.D. Iowa 1997), *citing Caspian Investments, Ltd. v. Vicom Holdings, Ltd.*, 770 F. Supp. 880, 884 (S.D.N.Y. 1991). {*22} Although the Fifth Circuit has not formally recognized the doctrine of international abstention, it has upheld the dismissal of an action based on "comity among nations." *See Torres v. Southern Peru Copper Corp.*, 113 F.3d 540, 544 (5th Cir. 1997).

Here, the court is not inclined to abstain from its "'virtually unflagging obligation' to exercise the jurisdiction conferred by Congress." *Finova*, 180 F.3d at 898, *quoting Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817, 47 L. Ed. 2d 483, 96 S. Ct. 1236 , 424 U.S. 800, 96 S. Ct. 1236, 1246, 47 L. Ed. 2d 483 (1976). Unlike the cases cited by Air Canada where federal courts have abstained from exercising jurisdiction in favor of parallel proceedings before foreign tribunals, the claims pending before this court and those involved in the Canadian declaratory judgment action do not substantially overlap. The Canadian action primarily involves the interpretation of Canadian CRS Regulations, which have dubious application to Sabre's breach of contract claim. For all the reasons previously articulated, Air Canada has failed to prove that Canada is a more appropriate forum for the resolution {*23} of this contract dispute. There is no compelling reason why Sabre's breach of contract claim and Air Canada's declaratory judgment action cannot proceed simultaneously in two different courts. Accordingly, Air Canada's alternative motion to stay should be denied.

**RECOMMENDATION**

Defendant's motion to dismiss for *forum non conveniens* or, in the alternative, to stay on grounds of international abstention should be denied.

DATED: December 9, 2002.

JEFF KAPLAN

UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO OBJECT**

On this date the United States magistrate judge made written findings and a recommended disposition of defendant's motion to dismiss for *forum non conveniens* or, in the alternative, to stay on grounds of international abstention. The United States district clerk shall serve a copy of these findings and recommendations on all parties by certified mail, return receipt requested. Pursuant to **28 U.S.C. § 636(b)(1)**, any party who desires to object to these findings and recommendations must file and serve written objections within ten (10) days after being served with a copy. A party filing objections {*24} must specifically identify those findings and recommendations to which objections are being made. The district court need not consider frivolous, conclusory or general objections. The failure to file such written objections to these proposed findings and recommendations shall bar that party from obtaining a *de novo* determination by the district court. *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. 1982). *See also Thomas v. Arn*, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985). Additionally, the failure to file written objections to proposed findings and recommendations within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error or manifest injustice. *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: December 9, 2002.

JEFF KAPLAN

UNITED STATES MAGISTRATE JUDGE

ROYAL AND SUN ALLIANCE INSURANCE COMPANY OF CANADA, Plaintiff-Appellant, v. CENTURY INTERNATIONAL ARMS, INC. AND CENTURY ARMS, INC., Defendants-Appellees.

Docket No. 05-5134-cv

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

466 F.3d 88; 2006 U.S. App. LEXIS 25350

April 12, 2006, Argued

October 10, 2006, Decided

**PRIOR HISTORY:**

{**1}

Insurer sued insured for payment of deductibles and reimbursement of expenses incurred defending and settling several lawsuits. The United States District Court for the Southern District of New York (Deborah A. Batts, Judge), dismissed plaintiff's complaint in favor of a prior pending action in Canada. We hold that international comity abstention did not warrant the dismissal of plaintiff's complaint.
**Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc., 2005 U.S. Dist. LEXIS 18562 (S.D.N.Y., Aug. 26, 2005)**

**DISPOSITION:** Vacated and remanded.

**COUNSEL:** ERICK J. KIRKER, Cozen O'Connor, Philadelphia, Pennsylvania, for Plaintiff-Appellant.

PAUL INDIG, Renzulli Law Firm, LLP, (John F. Renzulli, on the brief), New York, New York, for Defendants-Appellees.

**JUDGES:** Before: MCLAUGHLIN and CALABRESI, Circuit Judges, and LYNCH, District Judge. *

> * The Honorable Gerard E. Lynch, of the United States District Court for the Southern District of New York, sitting by designation.

**OPINION BY:** GERARD E. LYNCH

**OPINION:** {*90}  GERARD E. LYNCH, District Judge:

Plaintiff-appellant Royal and Sun Alliance Insurance Company of Canada ("RSA") seeks damages from defendants-appellees Century International Arms, Inc. and Century Arms, Inc. (collectively "Century America") for the reimbursement of defense expenses and the payment of deductibles {**2} it claims to be owed under various insurance policies. Century America moved to dismiss the complaint in deference to a pending action previously filed by RSA in Canada against Century America's Canadian affiliate, Century International Arms Ltd. ("Century Canada"), {*91} based on the same insurance policies and the same factual allegations. The United States District Court for the Southern District of New York (Deborah A. Batts, Judge), granted defendants' motion, concluding that considerations of comity warranted dismissal of RSA's action against Century America.

On appeal, RSA argues that the dismissal was improper because the district court failed to give proper weight to the "virtually unflagging obligation . . . to exercise the jurisdiction given [it]." **Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976).** We agree and therefore vacate and remand for further proceedings.

**BACKGROUND**

Century America is in the business of manufacturing and distributing firearms and munitions. n1 In connection with that business, Century America and its affiliate Century Canada obtained liability insurance policies from RSA {**3} for the time period between June 12, 1991, and March 25, 1994. During the policy period, Century America was sued by a number of individuals who alleged that they had suffered injuries caused by defects in Century America's products. RSA defended these lawsuits pursuant to the terms of the insurance policies, and eventually negotiated settlements with the various plaintiffs and paid the settlement amounts on behalf of Century America. At the conclusion of the actions, RSA requested reimbursement for defense expenses and deductibles it claimed to be owed under the policies. No payment was received.

- - -Footnotes- - -1

n1 Because Century America moved to dismiss the action, the district court accepted as true the facts asserted by RSA in the complaint. We do the same. See **Shah v. Meeker, 435 F.3d 244, 248 (2d Cir. 2006)**.


- - -End Footnotes- - -

RSA and Century Canada are both Canadian corporations, and under the insurance policies Century Canada is named as the first insured party while Century America is listed as an additional insured. {**4} Accordingly, when RSA did not receive the money it believed it was owed under the policies, RSA filed an action in Superior Court, Province of Quebec, District of Montreal, Canada, against Century Canada, seeking payment for its expenses and deductibles. In its response to the Canadian action, Century Canada asserted that the expenses and deductibles for which RSA sought reimbursement "relate[d] to events which occurred in the United States and claims asserted against name[d] insureds other than . . . [Century Canada]," Joint Appx. at 42, and that under the terms of the policies, the rights and obligations of RSA, Century Canada, and Century America apply "[s]eparately to each insured against whom claim is made or 'action' is brought," id. at 41.

Given Century Canada's averment that RSA had, in effect, sued the wrong insured party in the Canadian action, RSA filed the present complaint in the Southern District of New York against Century America. Soon after the case was filed, Century America moved to dismiss the complaint in favor of RSA's pending action against Century Canada. The district court granted Century America's motion to dismiss, stating that it had "the inherent {**5} power to stay or dismiss an action based on the pendency of a related proceeding in a foreign jurisdiction," but recognizing that its discretion was "limited by its obligation to exercise jurisdiction." **Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc., 2005 U.S. Dist. LEXIS 18562, No. 03 Civ. 7256, 2005 WL 2087870, at *2 (S.D.N.Y. Aug. 26, 2005)**. In exercising its {*92} discretion, the district court concluded that the existence of a parallel proceeding in Canada involving Century America's affiliate, coupled with Century America's consent to jurisdiction in Canada, militated in favor of dismissal. This appeal followed.

## DISCUSSION

We review a district court's dismissal of an action based on considerations of international comity for abuse of discretion. **JP Morgan Chase Bank v. Altos Hornos De Mexico, S.A., 412 F.3d 418, 422-23 (2d Cir. 2005)**. However, because we are reviewing a court's decision to abstain from exercising jurisdiction, our review is "more rigorous" than that which is generally employed under the abuse-of-discretion standard. **Hachamovitch v. DeBuono, 159 F.3d 687, 693 (2d Cir. 1998)**. "In review of decisions to abstain, there is little {**6} practical distinction between review for abuse of discretion and review de novo." Id. Of course, we review de novo a district court's conclusions of law. **JP Morgan Chase Bank, 412 F.3d at 423**.

Century America argues that the district court's decision was supported by the doctrine of international comity abstention. International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience." **Hilton v. Guyot, 159 U.S. 113, 163-64, 16 S. Ct. 139, 40 L. Ed. 95 (1895)**. While the doctrine can be stated clearly in the abstract, in practice we have described its boundaries as "amorphous" and "fuzzy." **JP Morgan Chase Bank, 412 F.3d at 423**, quoting Harold G. Maier, Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law, 76 Am. J. Int'l L. 280, 281 (1982). In addition to its imprecise application, even where the doctrine clearly applies it "is not an imperative obligation of courts but rather is a discretionary rule of 'practice, convenience, {**7} and expediency.'" Id., quoting **Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru, 109 F.3d 850, 854 (2d Cir. 1997)**.

Often, a party invoking the doctrine of international comity seeks the recognition of a foreign judgment. In this case, however, Century America argues that concerns of comity favor the recognition of a pending foreign proceeding that has yet to reach final judgment, and that proper deference to that proceeding requires abstention in domestic courts. This type of comity has been termed the "comity of the courts." See Joseph Story, Commentaries on the Conflict of Laws § 38 (1834) (distinguishing between the comity of the courts and the comity of nations), cited in **Hartford Fire Ins. Co. v. California, 509 U.S. 764, 817, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993)** (Scalia, J., dissenting).

Generally, concurrent jurisdiction in United States courts and the courts of a foreign sovereign does not result in conflict. **China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987)**. Rather, "'[p]arallel proceedings in the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until {**8} a judgment is reached in one which can be pled as res

judicata in the other.'" Id., quoting **Laker Airways, Ltd. v. Sabena Belgian World Airlines, 235 U.S. App. D.C. 207, 731 F.2d 909, 926-27 (D.C. Cir. 1984)**, citing **Colorado River, 424 U.S. at 817**. The mere existence of parallel foreign proceedings does not negate the district courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them." **Colorado River, 424 U.S. at 817**.

We have recognized one discrete category of foreign litigation that generally {*93} requires the dismissal of parallel district court actions -- foreign bankruptcy proceedings. A foreign nation's interest in the "equitable and orderly distribution of a debtor's property" is an interest deserving of particular respect and deference, and accordingly we have followed the general practice of American courts and regularly deferred to such actions. See **Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713-14, 715 (2d Cir. 1987)**; accord **JP Morgan Chase Bank, 412 F.3d at 424**; **Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir. 1999)**; {**9} **Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 999 (2d Cir. 1993)**.

Outside the bankruptcy context, we have yet to articulate a list of factors a district court should consider when exercising its discretion to abstain in deference to pending litigation in a foreign court. However, whatever factors weigh in favor of abstention, "[o]nly the clearest of justifications will warrant dismissal." **Colorado River, 424 U.S. at 819**. The task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification *for* the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction. **Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)**; see also **Colorado River, 424 U.S. at 813** ("Abstention from the exercise of federal jurisdiction is the exception, not the rule."). The exceptional circumstances that would support such a surrender must, of course, raise considerations which are not generally present as a result of parallel litigation, otherwise {**10} the routine would be considered exceptional, and a district court's unflagging obligation to exercise its jurisdiction would become merely a polite request.

Appellees contend that the above standards, articulated by the Supreme Court in Colorado River and Moses H. Cone, do not apply to the present matter because those cases involved abstention in favor of parallel state proceedings while the parallel action here at issue is pending in a foreign jurisdiction. Appellees' effort to distinguish these precedents is accurate, as far

as it goes, but it does not go far. The factors a court must weigh in exercising its discretion to abstain in deference to parallel proceedings will indeed differ depending on the nature of the proceedings. For example, if the parallel proceeding is in a foreign jurisdiction, the district court need not consider the balance between state and federal power dictated by our Constitution. Conversely, if the parallel proceeding is in a state court, the district court need not concern itself with issues of international relations. However, while the relevant factors to be considered differ depending on the posture of the case, the starting point for the inquiry {**11} remains unchanged: a district court's "virtually unflagging obligation" to exercise its jurisdiction. **Colorado River, 424 U.S. at 817**. In weighing the considerations for and against abstention, a court's "heavy obligation to exercise jurisdiction" exists regardless of what factors are present on the other side of the balance. **Id. at 820; see also Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc., 180 F.3d 896, 898 (7th Cir. 1999)** (applying "the same general principles" of Colorado River to international abstention); **Ingersoll Milling Mach. Co. v. Granger, 833 F.2d 680, 685 (7th Cir. 1987)** (stating that Colorado River and Moses H. Cone serve as a "helpful guide" when applied to cases of international abstention); cf. **Bigio v. Coca-Cola Co., 239 F.3d 440, 454 (2d Cir. 2000)** (as amended) ("When a court dismisses a complaint in favor of a foreign forum pursuant to the doctrine of international {**94} comity, it declines to exercise jurisdiction it admittedly has.").

The Supreme Court has recognized that a decision to abstain from exercising jurisdiction based on the existence of parallel {**12} litigation "does not rest on a mechanical checklist, but on a careful balancing of the important factors . . . as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." **Moses H. Cone, 460 U.S. at 16**. "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." **Colorado River, 424 U.S. 800, 818-19, 96 S. Ct. 1236, 47 L. Ed. 2d 483**, citing **Landis v. N. Am. Co., 299 U.S. 248, 254-55, 57 S. Ct. 163, 81 L. Ed. 153 (1936)**; see also **Moses H. Cone, 460 U.S. at 15** (stating that Colorado River did not "prescribe a hard-and-fast rule for dismissals of this type, but instead described some of the factors relevant to the decision").

In the context of parallel proceedings in a foreign court, a district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a

sovereign nation, fairness to litigants, and judicial efficiency. See **Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512, 1518 (11th Cir. 1994)**; {**13} see also **United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 212 (S.D.N.Y. 2002)**. Proper consideration of these principles will no doubt require an evaluation of various factors, such as the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction. See, e.g., **Finova Capital Corp., 180 F.3d at 898-99**; see also **Bigio, 239 F.3d at 454**. This list is not exhaustive, and a district court should examine the "totality of the circumstances," **Finova Capital Corp., 180 F.3d at 900**, to determine whether the specific facts before it are sufficiently exceptional to justify abstention.

In the present case, the district court did not identify any exceptional circumstances that would support abstention, and therefore the dismissal of the action was an abuse of discretion. The district court's decision to dismiss {**14} the action was based on four factors: the existence of the Canadian action against Century Canada, Century America's consent to jurisdiction in Canada, the affiliation between Century America and Century Canada, and the adequacy of Canadian judicial procedures. These factors led the district court to conclude that the action in Canada was a parallel action that provided an adequate forum for RSA's claims, and that therefore a dismissal of the case was warranted.

The district court's conclusion that the Canadian action is adequate and parallel merits a brief discussion. Century Canada and Century America are affiliated but separate entities. For two actions to be considered parallel, the parties in the actions need not be the same, but they must be substantially the same, litigating substantially the same issues in both actions. See **Dittmer v. County of Suffolk, 146 F.3d 113, 118 (2d Cir. 1998)**; see also **Schneider Nat'l Carriers, Inc. v. Carr, 903 F.2d 1154, 1156 (7th Cir. 1990)** ("Suits are parallel if substantially the same parties are litigating substantially the same issues simultaneously in two fora."). Whether Century Canada and Century America {**15} are substantially the same party for purposes {*95} of the relevant insurance policies was an issue raised in the Canadian action, where Century Canada asserted that it is not responsible for the obligations of Century America under the policies. The district court recognized that this issue was unsettled, but concluded that the question of which company is liable to RSA should be resolved in Canada. The fact

that Century America is not a party to the Canadian action did not, in the district court's view, present a problem for the unified adjudication of RSA's claims because Century America had consented to the jurisdiction of the Canadian courts.

On appeal, RSA argues that Century America's consent to jurisdiction is small beer, because the statute of limitations has expired on RSA's potential claim against Century America in Canada. This issue was not raised or addressed in the district court, but neither the district court nor RSA can be faulted for any oversight. In response to Century America's motion, RSA had argued that Century America was not subject to the jurisdiction of the Canadian courts; Century America did not consent to jurisdiction in Canada until its reply brief in the {**16} district court. Joint Appx. at 131. Accordingly, RSA was not afforded an opportunity to respond regarding other reasons why Canada might not be an adequate forum, such as the statute of limitations, and the issue was never presented to the district court for consideration.

Whether a statute of limitations renders a foreign jurisdiction inadequate for purposes of international comity abstention is a question we have not previously addressed. In the context of a motion to dismiss for *forum non conveniens*, a foreign jurisdiction is not adequate unless it "will permit [the plaintiff] to litigate the subject matter of its dispute." **Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 159 (2d Cir. 2005)**. However, while "abstention doctrines and the doctrine of *forum non conveniens* proceed from a similar premise . . . [,] abstention doctrine is of a distinct historical pedigree, and the traditional considerations behind dismissal for *forum non conveniens* differ markedly from those informing the decision to abstain." **Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 722-23, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996)**.

In any event, we need not decide whether {**17} Century Canada and Century America are sufficiently similar to support a finding that the Canadian action is parallel to this case. Nor need we decide whether statute-of-limitations problems render a foreign forum inadequate in the context of international comity abstention. Even if we were to adopt the district court's conclusions that the Canadian action is a parallel action and that Canada provides an adequate forum for RSA's claims against Century America, those conclusions do not support the district court's dismissal of the action.

The existence of a parallel action in an adequate foreign jurisdiction must be the beginning, not the end, of a district court's determination of whether abstention is appropriate. As we explained above, circumstances

that routinely exist in connection with parallel litigation cannot reasonably be considered exceptional circumstances, and therefore the mere existence of an adequate parallel action, by itself, does not justify the dismissal of a case on grounds of international comity abstention. Rather, additional circumstances must be present -- such as a foreign nation's interest in uniform bankruptcy proceedings -- that outweigh the district court's {**18} general obligation to exercise its jurisdiction. The district court did not identify any such special circumstances.

{*96} Finally, both parties address the question of whether, as an alternative to dismissing the action, the district court should have considered staying proceedings in deference to the Canadian litigation. Because the propriety of a temporary stay was not raised in the district court, we do not decide whether the entry of such a stay would have been appropriate. n2 However, on remand the district court may consider the propriety of a stay based on the pending Canadian action.

- - -Footnotes- - -2

n2 RSA argues that the district court must have considered whether to stay the proceedings because the Court recognized its power to either dismiss or stay the action. However, the district court's only references to a stay were made in passing and in connection with statements of legal authority. See **Royal & Sun Alliance Ins. Co., 2005 U.S. Dist. LEXIS 18562, 2005 WL 2087870, at \*2** (noting that courts have the inherent power to "stay or dismiss an action" and that the Supreme Court has not articulated a standard for determining whether to "stay or dismiss an action"). As the district court recognized, see id., Century America's motion sought only dismissal, not dismissal or a stay. See Joint Appx. at 4.

- - -End Footnotes- - -

{**19} In the context of abstention in deference to parallel state-court litigation, the Supreme Court has cautioned that "a stay is as much a refusal to exercise federal jurisdiction as a dismissal," because the decision to grant a stay "necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case." **Moses H. Cone, 460 U.S. at 28**. However, a measured temporary stay need not result in a complete forfeiture of jurisdiction. As a lesser intrusion on the principle of

obligatory jurisdiction, which might permit the district court a window to determine whether the foreign action will in fact offer an efficient vehicle for fairly resolving all the rights of the parties, such a stay is an alternative that normally should be considered before a comity-based dismissal is entertained.

For example, in Pravin Banker Associates, Ltd. v. Banco Popular Del Peru we approved of the district court's measured response to the existence of parallel proceedings in **Peru. 109 F.3d 850 (2d Cir. 1997)**. Initially, the district court granted a six-month stay to allow for "the orderly completion of [one defendant's] {**20} Peruvian liquidation proceedings." **Id. at 853**. However, at the conclusion of the stay and an additional two-month stay granted by the district court a defendant moved for "an indefinite stay to allow [defendant] Peru to complete its efforts to renegotiate its foreign debt." **Id. at 855**. The district court denied the defendant's motion, and we agreed with the court's decision, because an indefinite stay would have prejudiced the interests of the United States. Similarly, other Courts of Appeals have expressed a preference for measured stays of proceedings, where appropriate, in deference to parallel foreign litigation, instead of the more drastic measure of dismissal. See, e.g., **Posner v. Essex Ins. Co., 178 F.3d 1209, 1224 (11th Cir. 1999)** (holding that district court should have entered a stay instead of dismissal and noting that the Eleventh Circuit's jurisprudence "does not dictate that we should dismiss cases with respect to which foreign jurisdictions are conducting parallel proceedings"); **Turner Entm't Co., 25 F.3d at 1523** ("[A]t this stage of the litigation, the appropriate resolution is a stay rather {**21} than a dismissal of the American action."); **Ingersoll Milling Mach. Co., 833 F.2d at 686** ("Moreover, it is not insignificant -- indeed, it is very significant -- that the district court's action in this case was a decidedly measured one. The court did not dismiss the action; it simply stayed further proceedings . . . .").

Accordingly, on remand the district court may consider whether its obligation {*97} to exercise jurisdiction over this action could be satisfied despite the entry of a brief stay to allow the Canadian court to determine if, for example, Century Canada is liable for the money RSA claims to be owed under the policies. We do not now decide that such a stay would necessarily be appropriate, or that other bases for a temporary stay would not be proper. Those questions are left to the district court in the first instance.

## CONCLUSION

The factors relied upon by the district court in granting Appellee's motion to dismiss are not sufficient to overcome the virtually unflagging obligation of a

district court to exercise the jurisdiction conferred on it by Congress. The record contains no evidence of any exceptional circumstances that would justify abstention {**22} from jurisdiction. Accordingly, we hold that the district court abused its discretion by dismissing the action.

The judgment of the district court is vacated and remanded for further proceedings.

DOLE FOOD COMPANY, INC., Plaintiff, v. WALTER ANTONIO GUTIERREZ, et al., Defendants.

CASE NO. CV 03-9416 NM (PJWx)

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

2004 U.S. Dist. LEXIS 28429

July 13, 2004, Decided

July 13, 2004, Filed

**COUNSEL:** {*1} For Dole Food Company Inc, a Delaware corporation, Plaintiff: Frederick L McKnight, Kevin Ryan Behrendt, Michael Albert Tomasulo, Jones Day, Los Angeles, CA.

For Walter Antonio Gutierrez, Bayardo Jose Barrios Velasquez, Matilde Lidia Chavez Reyes, Petrona Del Transito Corea, Julia Ester Cruz Castro, Defendants: Howard B Miller, Girardi & Keese, Los Angeles, CA.
For Francisca Antonia Artola, Defendant: Howard B Miller, Thomas V Girardi, Girardi & Keese, Los Angeles, CA; Paul A Traina, Sean A Topp, Walter J Lack, Engstrom Lipscomb & Lack, Los Angeles, CA.

**JUDGES:** Nora M. Manella, United States District Judge.

**OPINION BY:** Nora M. Manella

**OPINION:** ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; AND (2) DENYING DEFENDANTS' MOTION TO STRIKE
**I. INTRODUCTION**

On December 23, 2003, Dole Food Company, Inc. ("Dole") filed its Complaint against various Nicaraguan residents, including: law firm shareholder Walter Antonio Gutierrez ("Gutierrez"); attorneys Boanerge Antonio Ojeda Baca ("Ojeda Baca") and Angel Salvador Espinoza Guerra ("Espinoza Guerra"); physician Luis Felipe Godoy Medina ("Godoy Medina"); clinic owner and/or operator Bayardo Jose Barrios Velasquez {*2} ("Barrios Velasquez"); Sonia Eduarda Franco Franco and 465 other named plaintiffs in Franco Franco v. Dow Chemical Co., Case No. CV 03-5094 ("Franco Defendants"); and 465 named plaintiffs in seven lawsuits filed in 2001 under Nicaraguan Special Law 364 in Managua ("Managua Defendants") (collectively "Nicaraguan Defendants").

The Complaint contains eight claims: (1) violation of RICO under **18 U.S.C. § 1962(c)** ("First Claim") (2) violation of RICO under **18 U.S.C. § 1962(d)** ("Second Claim"); (3) abuse of process ("Third

Claim"); (4) malicious prosecution ("Fourth Claim"); (5) unfair business practices under **Cal. Bus. & Prof. Code § 17200** ("Fifth Claim"); (6) declaratory judgment that Dole did not cause injuries to Managua Defendants through use of the pesticide dibromochloropropane ("DBCP") in Nicaragua ("Sixth Claim"); (7) declaratory judgment that Special Law 364 is unconstitutional ("Seventh Claim"); and (8) declaratory judgment that judgments rendered under Special Law 364 are [¹] unenforceable in the United States ("Eighth Claim").

Now pending is the Nicaraguan Defendants' motion to dismiss pursuant to {*3} **Fed. R. Civ. P. 12(b)(2)** on the ground that the court lacks personal jurisdiction over Gutierrez, Godoy Medina, Barrios Velasquez, Ojeda Baca, and Espinoza Guerra. The Nicaraguan Defendants also move to dismiss the Complaint pursuant to **Fed. R. Civ. P. 12(b)(6)**. In addition to challenging each claim on the merits, the Nicaraguan Defendants contend that the doctrines of international abstention and *forum non conveniens* warrant dismissal of this case. Also pending is the Nicaraguan Defendants' motion to strike: (1) the Complaint pursuant to California's anti-SLAPP statute, **Cal. Code Civ. Proc. § 425.16**; and (2) the request for punitive damages in the Complaint pursuant to **Fed. R. Civ. P. 12(f)**. n1

- - -Footnotes- - -1

n1 The Nicaraguan Defendants failed to comply with the meet and confer requirement with respect to their motion to strike under California's anti-SLAPP statute. See **Local Rule 7-3** ("counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, *preferably in person*, the substance of the contemplated motion and any possible resolution"). Defense counsel claim they did not determine that a motion to strike on this ground "was appropriate until after the April 2, 2004

meet and confer." Topp. Decl. P 4. The court will overlook defense counsel's violation of this rule this time, as this issue is now fully briefed. However, defense counsel are reminded that court may decline to consider future motions that fail to comply fully with this rule.

- - -End Footnotes- - -

{*4} **II. FACTS**

n2

- - -Footnotes- - -2

n2 The following facts are assumed true for purposes of this Motion only.

- - -End Footnotes- - -

A. Special Law 364

On November 23, 2000, the Nicaraguan legislature passed Special Law 364 specifically to address injuries arising from exposure to DBCP. Compl. P 31. Article 4 of Special Law 364 requires defendants to deposit $ 100,000 within 90 days of service of a complaint in order to take part in a lawsuit. Id. P 33. Article 8 further requires DBCP manufacturers to deposit 300 million cordobas (over $ 20 million) within 90 days "to guarantee payment of the possible compensation to the workers and other costs of the lawsuit." Compl. at 86. Article 6 retroactively repeals statutes of limitation that would otherwise apply to criminal or civil proceedings involving DBCP. Id. P 36.

Article 11 of Special Law 364 prescribes minimum damages of $ 100,000 for certain claims, irrespective of actual injury. Id. P 39. This amount is more than ten times greater than the maximum amounts typically awarded by {*5} Nicaraguan courts in comparable cases. Id. Special Law 364 requires special trial proceedings called "3-8-3," allowing only eight days for the presentation of all evidence, regardless of the complexity of a particular DBCP action. Id. P 40.

B. The Franco Action

In 2001, the Franco Defendants filed suit under Special Law 364, naming "Dole Food Corporation Inc.," a nonexistent entity, along with other corporate defendants ("Franco Action"). Id. P 42, 43. n3 On or about March 7, 2002, the Franco Defendants attempted to serve "Dole Food Corporation Inc." at the corporate headquarters of Dole Food Company, Inc. (i.e., Dole) and its subsidiary, Dole Fresh Fruit Company, in California. Id. PP 43, 45.

- - -Footnotes- - -3

n3 The Franco Defendants were represented by Ojeda Baca and Espinoza Guerra. Compl. P 42.

- - -End Footnotes- - -

Despite the fact that neither Dole nor Dole Fresh Fruit Company was named as a defendant, Dole Fresh Fruit Company attempted to appear and defend itself by posting the $ 100,000 bond required under Special Law {*6} 364. Id. PP 44, 48. On October 25, 2002, the court declared all actions taken by Dole Fresh Fruit Company "null and void" because Dole Fresh Fruit Company was "not one of the companies against which the lawsuit" had been filed. Id. P 52. On December 11, 2002, the court entered a $ 489.4 million judgment ("Franco Judgment") against Dow Chemical, Shell Oil Company, and "Dole Food Corporation Inc." Id. P 59.

C. The Franco Enforcement Action

On May 14, 2003, the Franco Defendants attempted to enforce the Franco Judgment against The Dow Chemical Company, Shell Chemical Company, and Dole in Los Angeles Superior Court ("Franco Enforcement Action"). See id. P 62. The Franco Defendants alleged that Dole had used DBCP on its banana plantations in Nicaragua from 1973 until it left in the mid-1980s. See 10/20/03 Order in **Franco v. Dow Chem. Co.**, 2003 U.S. Dist. LEXIS 26639, Case No. CV 03-5094 ("10/20/03 Order") at 2. After the action was removed, this court rejected this attempt to enforce the judgment against Dole because Dole was not a party to the action and was not named in the judgment. See id. at 7-11; Compl. PP 62, 69.

The court rejected the Franco Defendants' attempt to {*7} plead around the judgment by submitting a purported translation of the writ of execution, procured by Nicaraguan lead attorney Espinoza Guerra. See 10/20/03 Order at 5. The court explained that the Franco Defendants

have failed to provide the writ of execution, submitting instead an affidavit that purports to be a translation. This affidavit is suspect, not only because it changes the names of two parties that appeared in English in the Judgment, but because it contradictorily orders Dole Food Company Inc.' to pay, while reciting that neither Dole Food Company' nor dole [sic] Food Company, Inc.' was a party to the action.

See Compl. P 69 (quoting 10/20/03 Order at 8) (citations omitted). n4 The Nicaraguan Defendants' appeal of that decision is pending. See Triana Decl., Ex. D (Ninth Circuit Court of Appeals' 2/27/04 Order).

- - -Footnotes- - -4

n4 The court found the judgment unenforceable against Shell Chemical Company because that company was neither named in the judgment nor served with the underlying complaints. See 10/20/03 Order at 12. Nor was the judgment enforceable against The Dow Chemical Company, because that company had not been served with the underlying complaints. See id. at 12-16.

- - -End Footnotes- - -

{*8} D. The Managua Actions

In 2001, the Managua Defendants filed seven actions under Special Law 364 ("Managua Actions"). Compl. P 72. n5 The complaints were amended in 2003 and now name Shell Chemical Company, Standard Fruit Company, and Dole Food Company, Inc. as defendants. Id. P 73. In November 2003, Dole deposited the $ 100,000 required under Special Law 364 to obtain a ruling on its motion to have the Managua Actions litigated in the United States. Id. P 75. Although Dole specifically informed the court it was not submitting to the jurisdiction of the Nicaraguan courts, the court ruled on December 18, 2003 that, because Dole had tacitly submitted to the authority of the Nicaraguan court, the issues would be litigated in Nicaragua. Id. The court further required Dole to deposit the amount specified in Article 8 of Special Law 364 -- at least $ 20 million -- to proceed in the Managua Actions. Id. P 77.

- - -Footnotes- - -5

n5 The Managua Defendants are also represented by Ojeda Baca and Espinoza Guerra. Compl. P 72.

- - -End Footnotes- - -

{*9} Dole alleges: "The Managua Defendants have made and continue to make fraudulent claims and file and prosecute fraudulent lawsuits in Nicaragua under Special Law 364, with the intent of enforcing fraudulent judgments procured under Special Law 364 in the United States or elsewhere where Dole Food Company, Inc. or its affiliates have assets." Compl. P 118.

## III. DISCUSSION

A. Motion to Dismiss for Lack of Personal Jurisdiction

The Nicaraguan Defendants contend this court lacks personal jurisdiction over Gutierrez, Godoy Medina, Barrios Velasquez, Ojeda Baca, and Espinoza Guerra (collectively, "Professional Defendants"). Plaintiffs bear the burden of establishing personal jurisdiction, but need only show "facts that if true would support jurisdiction over the defendant." Doe v. Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001) (citations omitted).

Due process permits the exercise of personal jurisdiction over a nonresident defendant in the following four situations: (1) where the defendant is domiciled in the forum state when the lawsuit is commenced; (2) where the defendant is personally served with process while physically present in the forum state; (3) {*10} where the defendant consents to jurisdiction; or (4) where the defendant has sufficient "minimum contacts" with the forum state, such that the exercise of jurisdiction would not "offend traditional notions of fair play and substantial justice." Fitzgerald v. Wilson, 39 Cal. App. 4th 1419,1425-26, 46 Cal. Rptr. 2d 558 (1995) (citing Milliken v. Meyer, 311 U.S. 457, 85 L. Ed. 278, 61 S. Ct. 339 (1940); Burnham v. Superior Court, 495 U.S. 604, 610-18, 109 L. Ed. 2d 631, 110 S. Ct. 2105 (1990); Nat'l Rental v. Szukhent, 375 U.S. 311, 11 L. Ed. 2d 354, 84 S. Ct. 411 (1964); Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)). With respect to the fourth situation, courts may exercise either: (1) general jurisdiction, which arises out of a defendant's "continuous and systematic" contacts with the forum; or (2) specific jurisdiction, which arises where a defendant's specific contacts with the forum have given rise to the claim at issue. Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 414-16, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984).

Here, Gutierrez was personally served in California on March 1, 2004 and has stipulated that service was proper. See Tomasulo Decl., Ex. 3 (Proof of Service) at 44, Ex. 4 (Second Stipulated {*11} Order) at 47. This is sufficient to confer personal jurisdiction over Gutierrez. See Burnham, 495 U.S. at 610-19; Fitzgerald, 39 Cal. App. 4th at 1425, 46 Cal. Rptr. 2d 558. n6 In addition, Dole asserts this court can exercise specific jurisdiction over the remaining Professional Defendants. In the Ninth Circuit, a court may exercise specific jurisdiction if: (1) the nonresident defendant purposefully directs his activities toward the forum or resident thereof ("purposeful availment"); (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable. Dole Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002) (citations omitted).

- - -Footnotes- - -6

n6 The Nicaraguan Defendants cite **Core-Vent Corp. v. Nobel Indus, AB, 11 F.3d 1482, 1485 (9th Cir. 1993)**, for the proposition that even if a defendant is served within a forum, exercise of personal jurisdiction must still be reasonable. See Reply at 2 n. 2. To the contrary, Core-Vent does not add a reasonableness requirement if a defendant is served within a forum. See **Core-Vent, 11 F.3d at 1485** (discussing due process requirements to exercise personal jurisdiction if defendant is *not present* within territory of forum). Indeed, the Supreme Court has made clear that "jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of traditional notions of fair play and substantial justice." **Burnham, 495 U.S. at 619** (internal quotations omitted).

- - -End Footnotes- - -

{*12} **1. Purposeful Availment**

The purposeful availment requirement is met where the defendant allegedly: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. Id. (interpreting "effects" test derived from **Calder v. Jones, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984))** (citations omitted). The second requirement is satisfied when "the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." Id. (quoting **Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1087 (9th Cir. 2000)**).

Dole has alleged that the Professional Defendants' intentional acts include recruiting uninjured Nicaraguan residents to assert baseless claims against Dole, fabricating evidence of medical harm and exposure to DBCP, fraudulently demanding compensation for feigned injuries, procuring default and other judgments against U.S. companies, denying Dole a fair opportunity to present any defense, and seeking to enforce sham Nicaraguan judgments in the United States Compl. PP 2, 21-22, 98-101; Medina {*13} Decl., Ex. 1 (Barrios Velasquez Decl.) at 10 12. Thus, Dole has adequately pled that the Professional Defendants committed an intentional act.

The second and third requirements are met as to Nicaraguan lead attorney Espinoza Guerra, who procured the "translated version of the Writ of Execution" offered in the Franco Enforcement Action. See 10/20/03 Order at 5. This act was expressly aimed at the forum state and allegedly caused harm to Dole in the form of substantial attorneys' fees and costs and negative publicity in California. See Compl. PP 5, 6, 101. In contrast, these requirements are not met as to physician Godoy Medina, clinic owner Barrios Velasquez, or attorney Ojeda Baca. Even if these defendants participated in the Franco Action, Dole has failed to allege facts demonstrating their participation in the Franco Enforcement Action. Without such participation in the Franco Enforcement Action, these parties' actions in Nicaragua are too attenuated to meet the "express aiming" requirement, as the Franco Defendants could have sought to enforce the Franco Judgment outside California or even the United States.

**2. Forum-related Activities**

"The second requirement {*14} for specific jurisdiction is that the contacts constituting purposeful availment must be the ones that give rise to the current suit." **Bancroft & Masters, 223 F.3d at 1088**. This requirement is met here for Espinoza Guerra based on his procurement of the translated writ of execution. See 10/20/03 Order at 5. This requirement is not met for Godoy Medina, Barrios Velasquez, or Ojeda Baca, given the absence of facts demonstrating their participation in the Franco Enforcement Action.

**3. Reasonableness**

"Once it has been decided that a defendant purposefully established minimum contacts with a forum, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable in order to defeat personal jurisdiction." **Watts, 303 F.3d at 1114** (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)). To determine reasonableness, courts consider seven factors: (1) the extent of the defendant's purposeful injection into the forum state; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum {*15} state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. Id. (citation omitted); **Bancroft & Masters, 223 F.3d at 1088** (citation omitted).

In their Motion, the Nicaraguan Defendants make no attempt to apply these factors to Espinoza Guerra.

Instead, they merely assert that "Dole's allegations that [the Professional Defendants] are Nicaraguan citizens alone demonstrates that this Court does not have personal jurisdiction over them." Mot. at 6-7. This is inadequate to demonstrate a "compelling case" of unreasonableness. See **Bancroft & Masters. 223 F.3d at 1089** (reasonableness requirement met where defendant "attempted no factual showing with regard to Burger King factors"). n7 In sum, the court may exercise personal jurisdiction over Espinoza Guerra and Gutierrez, but not over Godoy Medina, Barrios Velasquez, or Ojeda Baca. n8

- - -Footnotes- - -7

n7 Although the Nicaraguan Defendants cursorily attempt to discuss some of the relevant factors in their Reply, this is too little, too late. See **In re Intuit Privacy Litig., 138 F. Supp. 2d 1272,1275 n. 3 (C.D. Cal. 2001)** ("this court can not consider arguments raised anew for the for first time in a reply brief as to so do would unfairly deny the non-moving party an opportunity to respond").

{\*16} 8

n8 Had the issue been raised, it is doubtful that this court would have found a basis to exercise personal jurisdiction over the Managua Defendants. However, this objection was waived by the Managua Defendants' failure to timely raise any objection to personal jurisdiction over them. See **Fed. R. Civ. Proc. 12(h)(1); Am. Ass'n of Naturopathic Physicians v. Hayhurst, 227 F.3d 1104, 1106 (9th Cir. 2000)** ("A fundamental tenet of the Federal Rules of Civil Procedure is that certain defenses under **Fed. R. Civ. P. 12** must be raised at the first available opportunity or, if they are not, they are forever waived.") (citing **Fed. R. Civ. P. 12(g), (h)**).

- - -End Footnotes- - -

B. Motion to Dismiss for Failure to State a Claim

Dismissal for failure to state a claim under **Rule 12(b)(6)** is appropriate if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." **Homedics, Inc. v. Valley Forge Ins. Co., 315 F.3d 1135, 1138 (9th Cir. 2003)** {\*17} (quoting **Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)**). When evaluating a **Rule 12(b)(6)** motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. See **Barron v. Reich, 13 F.3d 1370, 1374 (9th Cir. 1994)** (citation omitted). However, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." **Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir. 1998)** (citation omitted).

Generally, a district court may not consider any material beyond the pleadings in ruling on a **Rule 12(b)(6)** motion. **Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)** (citation omitted). The Ninth Circuit has carved out three exceptions to this rule. First, a court may consider material properly submitted as part of the complaint. **Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994)** (citation omitted). Second, a court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading[. {\*18} ]" **Id. at 454.** Third, a court may take judicial notice of matters of public record. **Lee, 250 F.3d at 688-89** (citation omitted).

If the court chooses to dismiss the complaint or a portion thereof, it must then decide whether to grant leave to amend. Generally, leave to amend is denied only if it is clear that amendment would be futile and "that the deficiencies of the complaint could not be cured by amendment." **Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987)** (quoting **Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980)** (per curiam)); see also **Poling v. Morgan, 829 F.2d 882, 886 (9th Cir. 1987)** (citations omitted).

1. International Abstention

The Nicaraguan Defendants argue that the international abstention doctrine requires that this court refuse to exert jurisdiction and dismiss the Complaint pursuant to **Rule 12(b)(6)**. The international abstention doctrine "allows a court to stay or dismiss an action where parallel proceedings are pending in the court of a foreign nation." **Supermicro Computer. Inc. v. Digitechnic, S.A., 145 F. Supp. 2d 1147, 1149 (N.D. Cal. 2001)** (citation {\*19} omitted). "In short, this doctrine allows a court to abstain from hearing an action if there is a first-filed foreign proceeding elsewhere." Id.

Here, no parallel proceedings are pending in the court of a foreign nation with respect to Dole's claims for RICO violations, abuse of process, malicious prosecution, or unfair competition. Nor is a foreign court adjudicating whether Special Law 364 violates the U.S. Constitution or whether judgments under Special Law 364 are enforceable in the United States.

Thus, the international abstention doctrine does not apply to seven of Dole's eight claims.

As to whether Dole caused injuries to the Managua Defendants through use of DBCP (Sixth Claim), seven Nicaraguan proceedings were filed in 2001 and amended in 2003. See Compl. PP 72, 73. Even if these proceedings are still pending, the court declines to dismiss the Sixth Claim based on international abstention for two reasons. First, the Ninth Circuit has not decided whether to adopt this doctrine. See **Supermicro Computer, 145 F. Supp. 2d at 1149.** Second, this claim can be resolved "by considering the discretionary nature of the jurisdiction of this court under the {*20} **Declaratory Judgment Act.**" See **id. at 1150.** The Sixth Claim is addressed in Part III, Section B(8), infra.

**2. Forum Non Conveniens**

The Nicaraguan Defendants next move to dismiss based on the doctrine of *forum non conveniens*, arguing that Nicaragua provides an adequate alternative forum. Under this doctrine, a court "may decline to exercise its jurisdiction, even though it has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum." **Altmann v. Republic of Austria, 317 F.3d 954, 972 (9th Cir. 2002)** (citing **Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249-50, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981)).** *Forum non conveniens* dismissal is not appropriate "where the alternative forum does not permit litigation of the subject matter of the dispute." **Piper Aircraft, 454 U.S. at 255 n. 22** (citation omitted); see **Watts, 303 F.3d at 1118** (foreign forum is available when entire case and all parties can come within jurisdiction of that forum).

A Nicaraguan court could not adjudicate Dole's RICO or state law claims. Nor could {*21} a Nicaraguan court decide whether Special Law 364 violates the U.S. Constitution or whether judgments under Special Law 364 are enforceable in the United States. Although Nicaraguan courts have permitted litigation over whether Dole caused injuries to the Managua Defendants through use of DBCP, this pertains to only one out of eight claims at issue. Thus, dismissal based on *forum non conveniens* is inappropriate. See **Piper Aircraft, 454 U.S. at 255 n. 22; Watts, 303 F.3d at 1118.**

**3. *RICO (First and Second Claims)***

Dole's First and Second Claims against the Nicaraguan Defendants assert RICO violations under **18 U.S.C. §§ 1962(c) and (d).** To prevail on a civil RICO claim, a plaintiff must prove that the defendant engaged in (1) conduct (2) of an enterprise (3) though a pattern (4) of racketeering activity that (5) caused injury to the plaintiff's business or property. **Chaset v. Fleer/Skybox Int'l, LP, 300 F.3d 1083, 1086 (9th Cir. 2002)** (citing **18 U.S.C. §§ 1962(c) and 1964(c)).** "A pattern of racketeering activity exists when a person commits two or more specified acts ('predicate {*22} acts') that have sufficient continuity and relationship so as to pose a threat of continued criminal activity." **Gutierrez v. Givens, 989 F. Supp. 1033, 1039 (S.D. Cal. 1997)** (citing **Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 450 (9th Cir. 1991)).** To establish the fifth element, a plaintiff must show that the prohibited conduct proximately caused concrete financial loss. **Chaset, 300 F.3d at 1086** (citation omitted). RICO further prohibits "any person to conspire to violate any of the provisions of subsections (a),(b), or (c)" of § 1962. **18 U.S.C. § 1962(d).**

The Nicaraguan Defendants challenge these claims on four grounds. First, they contend that the communications which form the basis for Dole's claims are privileged under the litigation privilege of **Cal. Civ. Code § 47(b).** A privileged publication or broadcast is one made in any legislative, judicial, or other proceeding. See **Cal. Civ. Code § 47(b).** Under the litigation privilege, communications with "some relation to judicial proceedings have been absolutely immune from tort liability[.]" **Rubin v. Green, 4 Cal. 4th 1187,1193, 17 Cal. Rptr. 2d 828, 847 P.2d 1044 (1993)** {*23} (internal quotations omitted).

The litigation privilege, however, does not apply to Dole's federal claims, including its claims under RICO. See **Kimes v. Stone, 84 F.3d 1121, 1127 (9th Cir. 1996)** (litigation privilege does not bar § 1983 claim due to **Supremacy Clause**); **Martinez v. California, 444 U.S. 277, 284, 62 L. Ed. 2d 481, 100 S. Ct. 553 (1980)** ("It is clear that the California immunity statute does not control this claim [under § 1983] even though the federal cause of action is being asserted in the state courts."); **Contreras v. Corinthian Vigor Ins. Brokerage, Inc., 25 F. Supp. 2d 1053, 1056 (N.D. Cal. 1998)** (any immunity under **Cal. Civ. Code § 47(b)** is preempted by **Fair Labor Standards Act** "by virtue of the **Supremacy Clause**"). The Nicaraguan Defendants respond that Dole's RICO claims are predicated entirely on communications with the California state court, i.e., the filing of the Franco Enforcement Action in Los Angeles Superior Court, and thus are privileged. See Reply at 4. The Ninth Circuit has rejected this argument. See **Kimes, 84 F.3d at 1124-27** (litigation privilege does not bar § 1983 claim premised on {*24} communications in state proceeding). n9

- - -Footnotes- - -9

n9 The Nicaraguan Defendants' argument that settlement communications in the Franco Enforcement Action are inadmissible under **Fed. R. Evid. 408** is equally unavailing. **Fed. R. Evid. 408** would bar the admission of settlement communications "to prove liability for or invalidity" of claims in the Franco Enforcement Action, not in a separate action for RICO.

- - -End Footnotes- - -

Second, the Nicaraguan Defendants assert that Dole has failed to allege that the Nicaraguan Defendants engaged in organized crime. The Ninth Circuit has refused to read an "organized crime" requirement into the RICO statute. **Wilcox v. Ho-Wing Sit, 586 F. Supp. 561, 568 (N.D. Cal. 1984)** (citing **United States v. Campanale, 518 F.2d 352, 363 (9th Cir. 1975)** (per curiam)). "Congress purposefully declined to require that a RICO defendant be proved a member of organized crime for two reasons": (1) "limitation of the statute to {\*25} organized crime members would create an unconstitutional status' offense based on affiliation rather than the conduct of defendants"; and (2) such a requirement would impose a "difficult if not impossible burden of proof against defendants adept at concealing their organized crime connections." Id.

The Nicaraguan Defendants cite three cases to argue that RICO was intended to combat organized crime. Mot. at 15 (citing **Chaset, 300 F.3d at 1087; Gutierrez, 989 F. Supp. at 1039; Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481-82, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)**). None of these cases, however, requires a showing that defendants engaged in organized crime as an additional element. Thus, while Congress undoubtedly was concerned with organized crime and focused on certain "kinds of activities by which individuals and associations engaged in organized crime maintained their income or influence[,]" the statute, **18 U.S.C. § 1962**, "makes unlawful such activities no matter who engages therein." **Campanale, 518 F.2d at 363**.

Third, the Nicaraguan Defendants argue that Dole's RICO claims fail to meet the heightened pleading {\*26} standard of **Fed. R. Civ. P. 9(b)**. To plead racketeering activity, Dole has alleged that the Nicaraguan Defendants engaged in the predicate acts of mail and wire fraud in violation of **18 U.S.C. §§ 1341 and 1343**. Compl. P 87. These types of predicate acts must be pled with particularity, including "time-place-manner-content details on the alleged instances

of mail and wire fraud." **Tate v. Pac. Gas & Elec. Co., 230 F. Supp. 2d 1072, 1084 (N.D. Cal. 2002); Lancaster Cmty. Hosp. v. Antelope Valley Med. Group, 940 F.2d 397, 405 (9th Cir. 1991); Moore v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir. 1989)** (allegations of fraud under § 1962(c) "must identify the time, place, and manner of each fraud plus the role of each defendant in each scheme") (citing **Schreiber Dist. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)**).

Here, Dole alleges that Gutierrez and the Franco Defendants' U.S. counsel used the U.S. and Nicaraguan wires to: (1) transmit money to their co-conspirators in Nicaragua prior to the filing of the instant action; {\*27} (2) communicate with others in a scheme to defraud Dole; and (3) arrange meetings with Dole to demand payment, including a meeting on January 14, 2003 between Gutierrez and Dole's general counsel. Compl. P 87. n10 These allegations fall short of the required particularity under **Rule 9(b)**. See **Tate, 230 F. Supp. 2d at 1084-85** (dismissing complaint with similar allegations); **Moore, 885 F.2d at 541** (affirming dismissal based on failure to attribute specific conduct to individual defendants or specify time, place, and content of predicate acts). Absent are *any* factual allegations of mail fraud. The few allegations of wire fraud "fail to identify with any specificity the who-what-when-where-how details" of the alleged fraud. See **Tate, 230 F. Supp. 2d at 1085**. Nor has Dole even attempted to attribute any specific use of the mail or wire to any defendant other than Gutierrez. See id.; **Moore, 885 F.2d at 541**. n11

- - -Footnotes- - -10

n10 The Franco Defendants' U.S. counsel, though mentioned in the Complaint, are not named as parties in the instant action.

{\*28} 11

n11 Dole responds: "The full extent of the facts surrounding Defendants' RICO violations is not known by Dole, but rather is within the knowledge of Defendants. Due to the nature of the fraudulent conduct of the Defendants, Dole does not have complete information to describe the conduct." See Opp. at 19. However, Dole cannot meet its pleading burden by promising that discovery will uncover more specific facts.

- - -End Footnotes- - -

While Dole's failure to plead mail and wire fraud with particularity is problematic, its inability to plead reliance is fatal. When mail or wire fraud is pled as a predicate for civil RICO, reliance must be pled. **Martin v. Dahlberg, Inc., 156 F.R.D. 207, 215 (N.D. Cal. 1994)** (citations omitted); **Daley's Dump Truck Serv., Inc. v. Kiewit Pac. Co., 759 F. Supp. 1498, 1504 (W.D. Wash. 1991)** (citations omitted), aff'd sub nom., **Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303 (9th Cir. 1992); Bank of China, New York Branch v. NBM LLC, 359 F.3d 171, 176 (2d Cir. 2004); Green Leaf Nursery v. E.I. Dupont De Nemours & Co., 341 F.3d 1292, 1306 (11th Cir. 2003)** {\*29} (citation omitted), cert. denied, **541 U.S. 1037, 158 L. Ed. 2d 723, 124 S. Ct. 2094 (2004); In re Mastercard Int'l Inc., 313 F.3d 257, 263 (5th Cir. 2002)** (citations omitted); **Chisolm v. TranSouth Fin. Corp., 95 F.3d 331, 337 (4th Cir. 1996)** (citation omitted); **Blount Fin. Servs., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987)**.

Here, Dole's alleged damages consist of costs due to litigation and negative publicity. Compl. PP 71, 89, 95. n12 Dole cannot allege that it actually relied on the Nicaraguan Defendants' fraudulent conduct in any way; nor can Dole allege that any reliance caused its damages. Dole attempts to avoid this conclusion by invoking an exception to the reliance requirement mentioned in **Proctor & Gamble Co. v. Amway Corp., 242 F.3d 539 (5th Cir. 2001)**. There, the Fifth Circuit "held open the possibility that a plaintiff company may not need to show reliance when a competitor lured the plaintiff's customers away by fraud directed at the plaintiff's customers." **Proctor & Gamble, 242 F.3d at 565** (citation omitted). The instant case fails to fall within this "narrow exception[,]" as {\*30} it neither involves a competitor of Dole nor use of mail or wire fraud directed at Dole's customers. See id.

- - -Footnotes- - -12

n12 It is doubtful that any damages that resulted from negative publicity would be recoverable under RICO. See **Chaset, 300 F.3d at 1086-87** ("To demonstrate injury for RICO purposes, plaintiffs must show proof of concrete financial loss, and not merely injury to a valuable intangible property interest.") (citing **Oscar v. Univ. Students Co-Operative Ass'n, 965 F.2d 783, 785 (9th Cir. 1992) (en banc)**).

- - -End Footnotes- - -

Given that Dole cannot plead the essential element of reliance, its First Claim, violation of **18 U.S.C. § 1962(c)**, is dismissed with prejudice. See **Noll, 809 F.2d at 1448; Poling, 829 F.2d at 886**. n13 Because Dole has failed to plead facts that would constitute a violation of **18 U.S.C. § 1962(c)**, its Second Claim for conspiracy to violate § 1962(c) likewise fails.

- - -Footnotes- - -13

n13 As this element is dispositive, the court need not reach the Nicaraguan Defendants' fourth argument that Dole has failed to plead the existence of a business enterprise.

- - -End Footnotes- - -
{\*31} **4. Abuse of Process (Third Claim)**

The Third Claim asserts that the Franco Defendants, Gutierrez, Espinoza Guerra, and Ojeda Baca abused the litigation process[k] by "seeking to enforce the fraudulent writ of execution, allegedly based on the Franco Judgment." Compl. P 98. "The tort of abuse of process constitutes the use of a legal process against another to accomplish a purpose for which it is not designed. Its elements are: (1) an ulterior motive; and (2) a willful act in the use of process not proper in the regular conduct of the proceedings." **Drum v. Bleau, Fox & Assocs., 107 Cal. App. 4th 1009, 1019, 132 Cal. Rptr. 2d 602 (2003)** (citations omitted). The "mere filing or maintenance of a lawsuit -- even if for an improper purpose -- is not a proper basis for an abuse of process action." **Lunsford v. Amer, Guarantee & Liab. Ins. Co., 18 F.3d 653, 655 (9th Cir. 1994)** (quoting **Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc., 42 Cal. 3d 1157, 1169, 232 Cal. Rptr. 567, 728 P.2d 1202 (1986))**.

Dole contends the following actions constitute willful and improper uses of process: filing the Franco Enforcement Action; filing against the non-existent entity, "Dole Food Corporation {\*32} Inc."; filing in a distant, corrupt forum; frustrating transfer; and frustrating Dole's ability to appear and defend itself. Opp. at 23; Compl. PP 25-30, 51, 53, 54, 57, 98, 99. Dole argues that these actions go beyond the mere filing or maintenance of a lawsuit, citing **Yu v. Signet Bank/Virginia, 69 Cal. App. 4th 1377, 82 Cal. Rptr. 2d 304 (1999)**, and **Barquis v. Merchants Collection Ass'n of Oakland, Inc., 7 Cal. 3d 94, 101 Cal. Rptr. 745, 496 P.2d 817 (1972)**. In those cases, banks or collection agencies filed thousands of actions in distant forums, knowing that jurisdiction or venue was improper, for the purpose of impairing the ability of

debtors, mostly low-income individuals, to defend relatively small monetary actions. **Yu, 69 Cal. App. 4th at 1389-90; Barquis, 7 Cal. 3d at 98, 105**.

Those cases involving "distant forum abuse" bear little, if any, resemblance to the instant case. It cannot be said that the Franco Defendants knew that jurisdiction or venue was improper in Nicaragua, as: (1) their alleged injuries occurred there, and (2) prior DBCP actions filed against Dole in the United States had been dismissed on *forum non conveniens* grounds. See **Delgado v. Shell Oil Co., 890 F. Supp. 1324, 1373 (S.D. Tex. 1995),** {*33} aff'd, **231 F.3d 165 (5th Cir. 2000)**. Moreover, in contrast to the small monetary actions against mostly low-income debtors in Yu and Barquis, the Franco Defendants sought $ 489.4 million against a handful of U.S. corporations. n14 Because Dole has failed to show a willful act in use of process not proper in the regular conduct of the proceedings, its abuse of process claim fails. Nor could Dole plead any additional facts to make this case analogous to those involving "distant forum abuse."

- - -Footnotes- - -14

n14 Nor is the court persuaded by Dole's argument that filing against the non-existent entity, "Dole Food Corporation Inc.," allegedly to preclude Dole from mounting any defense is "directly analogous" to the "distant forum abuse" in Yu.

- - -End Footnotes- - -

This claim also fails because the allegations in support of this claim are privileged under the litigation privilege of **Cal. Civ. Code § 47(b)**. The privilege applies to any communication made in judicial or quasi-judicial proceedings by litigants {*34} or other participants authorized by law to achieve the objects of litigation and that have some connection or logical relation to the action. **LiMandri v. Judkins, 52 Cal. App. 4th 326, 345, 60 Cal. Rptr. 2d 539 (1997)** (citing **Silberg v. Anderson, 50 Cal. 3d 205, 212, 266 Cal. Rptr. 638, 786 P.2d 365 (1990)**). The litigation privilege "applies only to communicative acts and does not privilege tortious courses of conduct." Id. (citations omitted). Thus, the "threshold issue in determining whether the litigation privilege applies is whether the defendant's conduct was communicative or noncommunicative." Id. (citation omitted).

The purpose of the privilege is to afford litigants and witnesses "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." **Silberg, 50 Cal. 3d at 213**

(citations omitted). "California courts have given the privilege an expansive reach, and held that the privilege is absolute, even if the result is inequitable." **Morales v. Coop. of Amer. Physicians, Inc., Mut. Prot. Trust, 180 F.3d 1060, 1062 (9th Cir. 1999)** (citations omitted). Any doubt as to whether the privilege applies is resolved {*35} in favor of applying it. Id. (citation omitted).

In essence, Dole argues that by preparing and submitting allegedly false documents in the Franco Action and Franco Enforcement Action, the Franco Defendants, Gutierrez, Espinoza Guerra, and Ojeda Baca engaged in a tortious course of conduct to which the privilege does not apply. However, such acts are communicative and come within the litigation privilege. See **Kupiec v. Amer. Int'l Adjustment Co., 235 Cal. App. 3d 1326, 1333, 1 Cal. Rptr. 2d 371 (1991)** ("The alleged concealment and misrepresentation of facts and the alleged actions of [the defendant] to abuse the discovery process are all acts that are, in their essential nature, communicative."); **Edwards v. Centex Real Estate Corp., 53 Cal. App. 4th 15, 30, 61 Cal. Rptr. 2d 518 (1997)** (while recognizing "necessarily harsh result of extending a privilege to false and fraudulent statements made in the course of a judicial proceeding[,]" California courts accept that result "on account of the overriding importance of the competing public policy in favor of enhancing the finality of judgments and avoiding unending postjudgment derivative litigation -- a policy which places the obligation {*36} on parties to ferret out truth while they have the opportunity to do so *during* litigation") (emphasis in original).

Dole argues that the litigation privilege does not apply because the Nicaraguan Defendants' conduct falls into the exclusion for any communication "made in furtherance of an act of intentional destruction or alteration of physical evidence undertaken for the purpose of depriving a party to litigation of the use of that evidence." Opp. at 25 (quoting **Cal. Civ. Code § 47(b)(2)**). "The plain language of the statute makes it clear the exception only applies when the alleged alteration or destruction is intended to deprive a party of use' of that evidence." **Laborde v. Aronson, 92 Cal. App. 4th 459, 464, 112 Cal. Rptr. 2d 119 (2001)**. According to Dole, the Nicaraguan Defendants submitted a translation of the writ of execution that replaced "Dole Food Corporation Inc." with "Dole Food Company Inc." Even if true, it could not be argued that there was an attempt to deprive Dole of the use of any evidence and therefore, the statutory exception does not apply. See id. (finding no attempt to deprive plaintiff of use of evidence where defendant allegedly altered {*37} document). Moreover, any

doubt as to whether the privilege applies is resolved in favor of applying it. **Morales, 180 F.3d at 1062**. n15

- - -Footnotes- - -15

n15 In a footnote, Dole also argues that the "extrinsic fraud" exception to the privilege applies based on its allegation that the Nicaraguan Defendants filed suit against a nonexistent entity in the Franco Action, excluded Dole from that proceeding, submitted fraudulent evidence at that proceeding, and attempted to enforce the resulting judgment. See Mot. at 25 n. 14. This "narrow" exception applies where "the aggrieved party [has been] deliberately kept in ignorance of the action or proceeding, or in some other way fraudulently prevented from presenting his claim or defense." **Moore v. Conliffe, 7 Cal. 4th 634, 643 n. 5, 29 Cal. Rptr. 2d 152, 871 P.2d 204 (1994)**. This exception does not apply here, as Dole was neither an "aggrieved party" to the Franco Action nor named in the Franco Judgment. See id. Nor was Dole fraudulently prevented from presenting a defense in the Franco Enforcement Action.

- - -End Footnotes- - -

{*38} Accordingly, the Third Claim is dismissed with prejudice for two independently sufficient reasons. First, Dole has not, and cannot, allege a willful act in the use of process not proper in the regular conduct of the proceedings. Second, the allegations in support of this claim are privileged under the litigation privilege of **Cal. Civ. Code § 47(b)**. n16

- - -Footnotes- - -16

n16 As a result, the court need not reach the Nicaraguan Defendants' arguments that Dole cannot plead an ulterior motive and that non-parties to the Franco Enforcement Action cannot be liable for abuse of process.

- - -End Footnotes- - -

**5. Malicious Prosecution (Fourth Claim)**

Dole also asserts malicious prosecution (Fourth Claim) against the Franco Defendants, Gutierrez, Espinoza Guerra, and Ojeda Baca for instituting the action to enforce the Franco Judgment in California. To establish a malicious prosecution claim, a plaintiff must show that a prior action was: (1) commenced by or at the direction of the defendant and was pursued to a legal termination {*39} in the plaintiff's favor; (2) brought without probable cause; and (3) initiated with malice. **Sheldon Appel Co. v. Albert & Oliker, 47 Cal. 3d 863, 871, 254 Cal. Rptr. 336, 765 P.2d 498 (1989)** (citations omitted); **Padres L.P. v. Henderson, 114 Cal. App. 4th 495, 513, 8 Cal. Rptr. 3d 584 (2004)** (citation omitted). Under California law, "a civil action for malicious prosecution will not lie when an appeal is pending." **Friedman v. Stadum, 171 Cal. App. 3d 775, 778-79, 217 Cal. Rptr. 585 (1985)** (citations omitted); see **Ray v. First Fed. Bank of California, 61 Cal. App. 4th 315, 319, 71 Cal. Rptr. 2d 436 (1998)** (case was not terminated until conclusion of appeal).

With respect to the first element, it is undisputed that the Franco Defendants commenced an action to enforce the Nicaraguan Judgment in California. This court's 10/20/03 Order granted Dole's motion to dismiss with prejudice. Given that the Franco Defendants' appeal of that decision is pending, Dole cannot plead a favorable termination of the underlying proceeding. See **Friedman, 171 Cal. App. 3d at 778-79; Ray, 61 Cal. App. 4th at 319**.

Dole contends that this rule applies only to state court decisions, citing **Calhoun v. Franchise Tax Bd., 20 Cal. 3d 881, 887, 143 Cal. Rptr. 692, 574 P.2d 763 (1978)**, {*40} for the proposition that a federal court decision is final regardless of whether it has been appealed. Dole's reliance on Calhoun is misguided, as that case was interpreting finality in the context of res judicata. See **Calhoun, 20 Cal. 3d at 887** ("The federal rule is that a judgment or order, once rendered, is final for purposes of res judicata until reversed on appeal or modified or set aside in the court of rendition.") (citations and internal quotations omitted). Morever, at least one district court in this circuit has relied on state law in requiring exhaustion of the appellate process before commencement of a malicious prosecution action. See **Smith v. Hurd, 699 F. Supp. 1433, 1435-36 (D. Haw. 1988)**.

This rule also makes sense as a matter of policy. As the Smith court explained: "This rule promotes the interests of judicial economy and consistency. Given the opposite rule, if the appellate court were to reverse the trial court in the underlying action, the trial court would face the dilemma of having either to allow both suits to proceed, or to dismiss the malicious prosecution action." **Id. at 1436**. Given that the Fourth Claim is not {*41} ripe due to the pending appeal, it is dismissed without prejudice. n17

- - -Footnotes- - -17

n17 In light of Dole's inability to plead the first element, the court need not reach the Nicaraguan Defendants' challenges to the remaining two elements or their contention that non-parties cannot be liable for malicious prosecution.

- - -End Footnotes- - -

## 6. Section 17200 (Fifth Claim)

The Fifth Claim for unfair business practices under **Cal. Bus. & Prof. Code § 17200** is directed against the Nicaraguan Defendants. **Section 17200** prohibits unlawful, unfair, or fraudulent business acts or practices. **Cal. Bus. & Prof. Code § 17200**. "Although the unfair competition law's scope is sweeping, it is not unlimited." **Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 182, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999)**. For example, § 17200 cannot be used to plead a cause of action predicated on conduct that is privileged under **Cal. Civ. Code § 47(b)**. Id.

In support of this {*42} claim, Dole has averred that the Nicaraguan Defendants falsified medical records and evidence of DBCP exposure in the Franco Action, denied Dole the opportunity to present a defense in the Franco Action, and falsified the writ of execution in the Franco Enforcement Action. Compl. PP 71, 113. For reasons explained in Part III, Section B(4), supra, such acts are communicative and come within the litigation privilege. See **Kupiec, 235 Cal. App. 3d at 1333; Edwards, 53 Cal. App. 4th at 30**. n18 Therefore, the Fifth Claim is dismissed with prejudice. See **Cel-Tech Communications, 20 Cal. 4th at 182**. n19

- - -Footnotes- - -18

n18 Moreover, to the extent this claim is based on unlawful conduct, Dole's failure to state a claim for RICO, abuse of process, or malicious prosecution dooms any derivative § 17200 claim.

19

n19 Because this claim is barred by the litigation privilege, the court need not reach the Nicaraguan Defendants' other arguments, namely that Dole has not pled: (1) fraud with particularity; and (2) that the Franco and Managua Defendants engaged in a business practice.

- - -End Footnotes- - -

{*43} **7. Declaratory Judgment that Dole Did Not Cause Injuries to Managua Defendants (Sixth Claim)**

In its Sixth Claim against the Managua Defendants, Dole seeks a declaratory judgment that Dole did not cause injuries to the Managua Defendants through the use of DBCP in Nicaragua. "The exercise of jurisdiction under the Federal Declaratory Judgment Act, **28 U.S.C. § 2201 (a)**, is committed to the sound discretion of the federal district courts." **Huth v. Hartford Ins. Co. of the Midwest, 298 F.3d 800, 802 (9th Cir. 2002)** (citations omitted), cert. denied, **537 U.S. 1233, 155 L. Ed. 2d 197, 123 S. Ct. 1356 (2003)**. In exercising its discretion, a district court "should avoid needless determination of state law issues; it should discourage litigants from filing declaratory actions as a means of forum shopping; and it should avoid duplicative litigation." **Id. 298 F.3d at 803** (citation omitted).

When other claims are joined with a claim for declaratory relief, however, "the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." **Snodgrass v. Provident Life and Accident Ins. Co., 147 F.3d 1163, 1167 (9th Cir. 1998)** {*44} (per curiam) (citation omitted). "Claims that exist independent of the request for a declaration are not subject to the Declaratory Judgment Act's discretionary jurisdictional rule. . . . Remanding only the declaratory component will frequently produce piecemeal litigation, a result the Declaratory Judgment Act was intended to avoid, rather than promote." Id. (citations omitted).

Given that the First through Fifth Claims, which were not subject to the Declaratory Judgment Act's discretionary jurisdictional rule, have been dismissed, the court need not worry about "piecemeal litigation." See **Snodgrass, 147 F.3d at 1167**. Thus, the court turns to the Huth factors. First, although resolving Dole's claim that it did not cause injuries to the Managua Defendants through the use of DBCP in Nicaragua would not present state law issues, it would require needless determination of liability and damages under Nicaraguan tort law. Second, this claim appears to be an attempt to override the Managua Defendants' choice of forum in resolving their DBCP claims. n20 Third, resolving this claim would duplicate litigation that has already occurred in Nicaragua. Based on the {*45} Huth factors, the court declines to exercise jurisdiction over the Sixth Claim.

- - -Footnotes- - -20

n20 To the extent Dole has alleged that such claims cannot be resolved adequately

in Nicaragua, Dole's recourse lies in opposing the enforcement of any judgment rendered in Nicaragua.

- - -End Footnotes- - -

## 8. Declaratory Judgment that Special Law 364 Is Unconstitutional (Seventh Claim) and that Judgments Rendered Under Special Law 364 Are Unenforceable in the United States (Eighth Claim)

Dole's Seventh Claim against the Managua Defendants seeks a declaratory judgment that Special Law 364 is unconstitutional, as it is offensive to the public policy of the United States and California. The Eighth Claim against the Managua Defendants requests a declaratory judgment that judgments rendered pursuant to Special Law 364 are unenforceable in the United States.

As a threshold issue, actions under the Declaratory Judgment Act are justiciable only in cases in which an "actual controversy" exists. See **28 U.S.C. § 2201 (a) {*46}** . "This requirement circumscribes federal jurisdiction to real conflicts so as to preclude the courts from gratuitously rendering advisory opinions with regard to events in dispute that have not matured to a point sufficiently concrete to demand immediate adjudication and thus may never materialize as actual controversies." **Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002)**. The touchstone is "whether the declaratory relief sought relates to a dispute where the alleged liability has already accrued or the threatened risk occurred, or rather whether the feared legal consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass." **Id. at 406-07** (citing **Thomas v. Union Carbide Agric. Prod. Co., 473 U.S. 568, 580-81, 87 L. Ed. 2d 409, 105 S. Ct. 3325 (1985))**.

Courts have found no "actual controversy" exists where a party seeks a declaratory judgment invalidating a potential future foreign judgment. For example, in **Dow Jones, 237 F. Supp. 2d at 399**, Dow Jones sought a declaratory judgment to preclude Harrods from pursuing claims for defamation asserted against Dow Jones in the **{*47}** United Kingdom arising from the publication of an article in the Wall Street Journal. The court dismissed the case, as no judgment had been rendered and it was uncertain whether "Harrods would attempt to enforce a favorable judgment in the United States or elsewhere[.]" **Dow Jones, 237 F. Supp. 2d at 408**.

A district court in Illinois dismissed a declaratory judgment action under similar circumstances:The court finds that the purported controversy,' that a judgment

in favor of Fitzroy against Basic in the NZ action would be an unenforceable judgment, is not an actual controversy' as required by the Constitution. Basic seeks to have the court declare a future foreign judgment invalid and unenforceable even before Fitzroy has the opportunity to have the future judgment entered by the New Zealand court and confirmed in a United States federal court.**Basic v. Fitzroy Eng'g, Ltd., 949 F. Supp. 1333, 1337 (N.D. Ill. 1996), aff'd, 132 F.3d 133, 1997 WL 753336 (7th Cir. 1997)**.

In affirming the dismissal for lack of subject matter jurisdiction, the Seventh Circuit explained that the "Constitution does not allow a federal district court to **{*48}** issue advisory opinions based on [fears] of future judgments and speculation." **Basic, 132 F.3d 133, 1997 WL 753336, at *5**. The court added:

Assuming that a New Zealand court renders a judgment in Fitzroy's favor, Fitzroy must then have to bring an enforcement action against Basic. . . . According to Basic, any judgment against him in the NZ action should not be recognized by an Illinois court, or by a federal court sitting in Illinois, because the cause of action on which the judgment [will be] based is repugnant to the public policy of this state. Basic will have that opportunity to make that argument. But that opportunity will take place on another day and in front of another judge.

**Id. 132 F.3d 133 at *9** (citations and internal quotations omitted). See **Eastman Kodak Co. v. Kavlin, 978 F. Supp. 1078, 1090 (S.D. Fla. 1997)** ("Quite clearly, Kodak has sought a declaratory judgment in this Court in order to preempt the effect of a possible adverse judgment in Bolivia. Under such circumstances, a federal court should stay its hand. The declaratory judgment count is dismissed.").

Here, Dole has failed to allege that the Managua Defendants have obtained a **{*49}** judgment. Instead, Dole alleges: "The Managua Defendants have made and continue to make fraudulent claims and file and prosecute fraudulent lawsuits in Nicaragua under Special Law 364, with the intent of enforcing fraudulent judgments procured under Special Law 364 in the United States or elsewhere where Dole Food Company, Inc. or its affiliates have assets." Compl. P 118. Thus, Dole asks this court to declare unenforceable judgments not yet rendered or sought to be enforced in the United States. Under such circumstances, the court finds no "actual controversy" exists, as required by the Constitution. See **Dow Jones, 237 F. Supp. 2d at 408**; **Basic, 949 F. Supp. at 1337**; **Basic, 132 F.3d 133, 1997 WL 753336, at *5**; **Eastman Kodak, 978 F. Supp. at 1090**. Moreover, even if the Managua Defendants obtain a judgment against Dole, it is uncertain whether they will attempt

to enforce that judgment in the United States -- much less California. See **Dow Jones, 237 F. Supp. 2d at 408.**

If and when the Managua Defendants obtain a judgment against Dole and attempt to enforce it, Dole will have an opportunity to challenge Special Law {*50}  364 and any actual judgment rendered thereunder. But as the Seventh Circuit put it, "that opportunity will take place on another day and in front of another judge." **Basic, 132 F.3d 133, 1997 WL 753336, at \*9.** Accordingly, the Seventh and Eighth Claims are dismissed for lack of subject matter jurisdiction. n21

- - -Footnotes- - -21

n21 Although the Nicaraguan Defendants did not raise the issue of subject matter jurisdiction, the court may raise it sua sponte at any time. See **Rath Packing Co. v. Becker, 530 F.2d 1295, 1303 (9th Cir. 1976)** ("The question of subject matter jurisdiction may be raised by the parties at any time or by the court sua sponte.") (citations omitted); **Fed. R. Civ. P. 12(h)(3)** ("Whenever it appears by the suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action."). Given this issue is dispositive, the court need not reach the Nicaraguan Defendants' arguments for dismissal of these claims on other grounds.

- - -End Footnotes- - -
{*51}  C. Motion to Strike

Finally, the Nicaraguan Defendants move to strike: (1) the Complaint pursuant to California's anti-SLAPP statute; and (2) the request for punitive damages in the Complaint pursuant to **Fed. R. Civ. P. 12(f).** The motion to strike the Sixth Claim is also denied as moot, as the court has declined to exercise its jurisdiction over that claim. The motion to strike the remaining claims is denied as moot, as all other claims have been dismissed. n22 The motion to strike punitive damages sought for the First through Fourth Claims is also denied as moot, as those claims have been dismissed.

- - -Footnotes- - -22

n22 Morever, the motion to strike the First, Second, Sixth, Seventh, and Eighth Claims is in appropriate, because the anti-SLAPP statute is not applicable to federal claims.

**Globetrotter Software, Inc. v. Elan Computer Group, Inc., 63 F. Supp. 2d 1127, 1130 (N.D.Cal. 1999).**

- - -End Footnotes- - -
## IV. CONCLUSION

For the foregoing reasons, the court **GRANTS** the Nicaraguan {*52}  Defendants' motion to dismiss Godoy Medina, Barrios Velasquez, and Ojeda Baca for lack of personal jurisdiction. The court **DENIES** the motion to dismiss Gutierrez and Espinoza Guerra for lack of personal jurisdiction. The following claims are dismissed for lack of subject matter jurisdiction: the Seventh Claim for declaratory judgment that Special Law 364 is unconstitutional and the Eighth Claim for declaratory judgment that judgments rendered pursuant to Special Law 364 are unenforceable in the United States. The court declines to exercise jurisdiction over the Sixth Claim for declaratory judgment that Dole did not cause injuries to the Managua Defendants through the use of DBCP in Nicaragua.

The following claims are dismissed with prejudice: the First and Second Claims under RICO, the Third Claim for abuse of process, and the Fifth Claim under § 17200. The court dismisses without prejudice the Fourth Claim for malicious prosecution. Any amended complaint may not include a claim for malicious prosecution unless all appeals in the Franco Enforcement Action have been resolved in Dole's favor. Finally, the Nicaraguan Defendants' motion to strike is **DENIED** as moot.

IT {*53}  IS SO ORDERED.

DATED: July 13, 2004

Nora M. Manella

United States District Judge